REXFORD G. TUGWELL, GOBERNADOR DE PUERTO RICO, demandante y apelante, *v.* BONOCIO CAMPOS SEGUNDO, ALCALDE DE BARCELONETA, querellado y apelado.

Núm. 15.—*Sometido:* Enero 21, 1946. *Resuelto:* Febrero 8, 1946.

*Hon. Procurador General E. Campos del Toro, Luis F. Camacho y Guillermo A. Gil, Procuradores Generales Auxiliares,* abogados del apelante; *Guillermo S. Pierluisi y C. H. Juliá,* abogados del apelado.

EL JUEZ PRESIDENTE SEÑOR TRAVIESO emitió la opinión del tribunal.

En octubre 11 de 1945, el Gobernador de Puerto Rico, sometió a la consideración y resolución de la Asamblea Municipal de Barceloneta un pliego de cargos formulados por él contra Bonocio Campos Segundo, Alcalde de dicho municipio. Los cargos son, en síntesis, como sigue:

*Primero:* Que en septiembre 8 de 1944, actuando como Alcalde, recibió de la Central Plazuela Sugar Co. un cheque por $400, como contribución de dicha corporación al Proyecto

de Construcción y Reparación del Camino Vecinal "Bocas", auspiciado por el Municipio de Barceloneta en colaboración con el Plan de Emergencia de Guerra (P.E.G.); que endosó y cobró dicho cheque ilegalmente; y que hasta el 20 de septiembre de 1945 no había ingresado su importe en el Tesoro del Municipio.

*Segundo:* Que en noviembre 8 de 1944 recibió otro cheque de la misma corporación, también por $400, para ser destinado al mismo Proyecto del Camino Vecinal "Bocas"; y que endosó y cobró dicho cheque ilegalmente, sin que hasta el 20 de septiembre de 1945 hubiese ingresado su importe en los fondos del Municipio.

*Tercero:* (*a*) Que allá para los meses de septiembre, octubre y noviembre de 1944, actuando como alcalde, en violación de las disposiciones del artículo 70 de la Ley Municipal, cedió sin la previa autorización de la Asamblea Municipal solares propiedad del Municipio a diecisiete personas distintas.

(*b*) Que en julio 28 de 1944, también actuando como alcalde y sin la debida autorización de la Asamblea Municipal, cedió un solar para la construcción de un templo a la Logia Odfélica Constancia, de Barceloneta.

(*c*) Que en igual forma cedió un solar, para la construcción de un templo, a la Iglesia de Dios Pentecostal Inc., de Barceloneta.

*Cuarto:* (*a*) Que en julio de 1945, sin celebración de la correspondiente subasta y en violación de lo dispuesto en los artículos 8, inciso 5º, y 79 de la Ley Municipal, dió en arrendamiento a Baldoíno Miranda solares y sitios públicos del Municipio para ser usados durante las fiestas patronales para la instalación de picas, machinas de caballitos y otros medios de diversión, habiendo obtenido por dicha concesión la suma de $700.

(*b*) Que en violación de la sección tercera, letra (*a*) del Reglamento de la Contabilidad Municipal y del artículo 68

de la Ley Municipal, entregó los $700 que recibiera de Baldoíno Miranda, al Sr. Antonio García, Tesorero del Comité de Festejos de las Fiestas Patronales, quien no era Tesorero Municipal ni persona autorizada para recibir y guardar dichos fondos, ni había prestado fianza por la custodia e inversión de dichos fondos.

*Quinto:* (a) Que allá para el mes de octubre de 1944, permitió y consintió que se expidiera a Israel Núñez Román, chófer de la Ambulancia Municipal, un cheque por $40, por su trabajo del mes de octubre, constándole que dicho chófer solamente había trabajado durante la última quincena de dicho mes.

(b) Que entregó el referido cheque de $40 al chófer Israel Núñez Román, ordenándole que lo endosara y cobrara el importe de la segunda quincena de octubre y le devolviera, como le devolvió, la suma de $20, cantidad que el Alcalde querellado se apropió para su beneficio personal, sin ingresarla en el Tesoro Municipal, defraudando así al Municipio.

*Sexto:* Que durante el período de julio de 1944 a septiembre 19 de 1945, con el propósito deliberado de burlar las disposiciones del artículo 10 de la Ley Municipal, vendió leche al Municipio de Barceloneta al precio de catorce centavos el litro, haciendo aparecer falsamente a José Tirado como dueño de la leche; todo ello en perjuicio de los intereses económicos del Municipio, por cuanto el precio de la leche en el mercado local, durante el indicado período, era de doce centavos el litro.

La vista de los cargos ante la Asamblea Municipal de Barceloneta comenzó el día 30 de octubre de 1945 y continuó durante los días 1, 8 y 21 de noviembre de 1945. En diciembre 3 de 1945 la Asamblea dictó su resolución exonerando al Alcalde querellado, de toda culpabilidad. No estando conforme con dicha resolución, el Gobernador interpuso el presente recurso, basándolo en los siguientes fundamentos de derecho:

1. Que la Asamblea Municipal cometió grave error al negarse a dar posesión de sus cargos de asambleístas municipales a los señores Encarnación Andino y Ramón Matías Santana, quienes habían sido debidamente nombrados por la propia Asamblea, privando así a dichos dos asambleístas de su derecho a intervenir como tales en la vista y resolución de los cargos formulados contra el alcalde.

2. Que la Asamblea Municipal cometió serio y grave error al apreciar la prueba y al dictar una resolución contraria a derecho y a la prueba practicada.

Nos abstendremos de discutir el primer señalamiento. El propio apelante admite en su alegato y así lo hizo constar en su informe oral, que el error enunciado "no reviste capital importancia o significación."

Pasemos ahora a examinar la prueba para poder determinar si la Asamblea cometió error al apreciarla. Empezaremos por la prueba de cargo:

1 y 2.—Para sostener los dos primeros cargos, el fiscal presentó como testigo al Sr. Rafael V. Urrutia, Director de la División de Operaciones del Programa de Emergencia de Guerra. Declaró:

Que el trabajo de reparación del camino "Bocas" comenzó en agosto 16, 1944 y terminó en septiembre de 1945, habiendo ocurrido una interrupción desde febrero 28 a marzo 23, 1945, porque los fondos asignados originalmente por el P.E.G. se agotaron; que de los records no aparece que el Alcalde notificara a los empleados del P.E.G. sobre el donativo de la Central Plazuela; que en la fecha en que se empezó la reparación del camino, el declarante no era el encargado del proyecto; que no sabe si el Alcalde trató con la persona encargada del trabajo; que el declarante asumió la dirección en mayo 1º. de 1945; que de los records no aparece que se notificara al Alcalde que los fondos se habían agotado; y que no sabe si el Alcalde notificó al encargado de la obra sobre el donativo de $800 que había recibido.

3. (a) Las partes estipularon que la Asamblea Municipal en ningún momento autorizó la cesión de solares a ninguna de las diecisiete personas mencionadas en este cargo.

3. (b) Domingo Pérez Hernández, Juez de Paz de Barceloneta, reconoció su firma al pie de un *affidavit* suscrito por Bonocio Campos Segundo, Alcalde de Barceloneta, cediendo un solar a la Logia Odfélica Constancia. Declaró que el documento fué jurado y firmado ante él por el Alcalde. El *affidavit* fué admitido en evidencia y dice así:

"Permiso concediendo un solar a la Resp. Logia Constancia de Barceloneta Núm. 11299. Por medio de este documento, y haciendo uso de la Autoridad, que me concede la Ley Municipal, cedo en propiedad el solar contiguo a la casa propiedad del Sr. José Ortiz, Jr., actualmente habitada por el Sr. Felipe Sánchez, a la Resp. Logia Constancia de Barceloneta Núm. 11299. Lo que firmo muy gustosamente, hoy día 24 de julio del año 1944. Firmado: Bonocio Campos' Segundo, Alcalde. Suscrito y jurado ante mí hoy día 28 de julio del año 1944. Firmado: Domingo Pérez Hernández, Juez de Paz. Affidavit Núm. 31135.—Sello Oficial."

Las partes estipularon que la Asamblea Municipal nunca autorizó al Alcalde para ceder el solar a la Logia Constancia.

3. (c) Para probar este cargo el fiscal presentó a Rafael Anglade, quien declaró que se dedica a la predicación del Evangelio en la Iglesia Pentecostal en Barceloneta; que allá para abril o mayo de 1944 el declarante habló con el Alcalde Campos sobre la cesión de un solar situado en la calle Giorgetti, para edificar allí una iglesia; que el Alcalde le hizo una cesión verbal y entonces se fabricó la iglesia; que no pagó cantidad alguna por dicha cesión, ni se firmó escritura o documento alguno. Preguntado si le constaba que el solar que le fuera cedido por el Alcalde era del Municipio, explicó: que él hizo una petición a la Asamblea Municipal para que le cedieran el solar y la Asamblea ni siquiera tuvo la cortesía de contestarle; que entonces se entrevistó con el Alcalde y éste le dió el permiso. Al oír lo declarado por el testigo, el Presidente de la Asamblea intervino para hacer

constar en el récord lo siguiente: "En ningún momento se le ha dado permiso a nadie, por el motivo de que no tenemos conocimiento que el Municipio tenga título de propiedad sobre esos terrenos para darle autoridad a esos solares".

4. Para sostener el cargo número cuatro, el Fiscal ofreció el testimonio de Jesús M. Rivera, Secretario-Auditor Municipal, quien declaró: que durante el mes de julio de 1945, ni antes de esa fecha, se celebró subasta alguna para ceder solares y calles del Municipio a Baldoíno Miranda; que la Asamblea no autorizó el arrendamiento de calles y solares a Miranda; que en los libros no consta que se depositara el dinero pagado por Miranda; que el Alcalde nunca le entregó una relación de los gastos incurridos o desembolsos hechos de los fondos adquiridos por la cesión hecha por el Alcalde a Miranda.

Declaró Baldoíno Miranda, que antes del 6 de junio de 1945 el Alcalde habló con él y le pidió que se hiciera cargo de las fiestas patronales porque a nadie le gustaba ir a rematarlas; que el Alcalde le dijo que en las fiestas pasadas no habían podido conseguir machinas y caballitos y por eso quería que se hiciera cargo de eso; que la comisión de las fiestas le visitó y le autorizó para que pusiera los aparatos en la calle Giorgetti; que él no celebró contrato alguno con la comisión, en la cual figuraba el Alcalde y otros señores del pueblo; que no contrató con el Alcalde; que es verdad que él dió $700 y después dió un beneficio para las fiestas de $50 más; que los $700 fué todo el beneficio que él obtuvo durante las fiestas, después de pagar $500 por el arrendamiento de los aparatos; que hizo todo eso por cooperar y no para lucrarse y que no ganó ni un centavo; que fué después de terminadas las fiestas que le entregó los $700 al Alcalde; que dió ese dinero para cubrir los gastos de las fiestas.

Antonio García, Tesorero del Comité de las Fiestas Patronales, declaró: que fué él quien guardó los fondos que

se recaudaron y que ascendieron a unos $1,200; que ni el Alcalde ni ninguna otra persona le requirieron para que depositara esos fondos en el Tesoro Municipal; que la entrada que aparece en su libreta, de $700 "por arrendamiento de los solares para picas y machinas a Pepe Miranda", la hizo él por su propia cuenta sin que se lo insinuara ninguno de la Comisión; que durante los últimos veinticinco años ha sido Tesorero de las fiestas patronales; que en varios años se arrendaron los solares sin llenar los requisitos de ley; que lo importante es que él anotó en su libreta la cantidad que le fué entregada; que le dió al Alcalde un papelito con una relación de los ingresos y egresos; que el Alcalde le pidió esa relación como uno o dos meses antes de la llegada del inspector de Auditoría; que el remanente, que ascendió a $302, fué ingresado por él en el Tesoro Municipal en septiembre 19 de 1945, después de la llegada del inspector; que fué el inspector quien le dijo que llevara esos fondos al tesoro municipal; que no hizo en su libreta ningún ingreso de $50 por el día adicional que estuvieron las picas en los solares del pueblo.

5. La evidencia para sostener. el cargo número cinco fué la siguiente:

Israel Núñez, chófer de la ambulancia municipal, declaró que él empezó a trabajar como chófer el 16 de octubre de 1944; que al terminar el mes de octubre el Alcalde le mandó a buscar y le dijo: "Aquí tiene un cheque por $40; coge ese cheque, lo firmas, me lo cambias y me traes $20"; que el declarante cambió el cheque y le entregó los $20 al Alcalde personalmente. El cheque fué identificado por el testigo y admitido en evidencia. También se admitió la nómina en la cual aparece Núñez cobrando $40 como chófer de la ambulancia. La nómina está firmada por el Director de Beneficencia y aprobada por el Alcalde. Continuó declarando que estuvo trabajando en el municipio hasta noviembre 26 de 1944; y que no trabajó durante el mes de diciembre. Re-

preguntado por la defensa declaró que el Alcalde le dijo que los $20 que tenía que traerle eran "para echarlos al fondo municipal"; que se lo dijo en presencia de seis u ocho personas que estaban allí; que Bonocio Campos fué quien lo despidió de su trabajo, porque le contaban mentiras diciéndole que no estaba en la ambulancia; que el Alcalde lo regañaba por tardanzas en los viajes.

Declaró el Tesorero Municipal que hasta la fecha en que declaraba, el Alcalde no había ingresado en el Tesoro Municipal los $20 que Núñez declaró le habían sido pagados en exceso.

6. Para sostener el sexto cargo, el Fiscal llamó a declarar al Alcalde querellado, quien declaró: que conoce a José Tirado desde hace algunos años; que nunca ha tenido negocios con Tirado, pero que un hijo suyo le vendió un establecimiento; que después Tirado vendió el mismo negocio a una hija del declarante; que fué en el mes de septiembre que le informaron que Tirado le vendía leche al Municipio; que sabía que Tirado tenía un contrato con la Superintendente del Hospital para venderle la leche para los pacientes, habiendo empezado a servir la leche cuando compró el negocio, en junio o julio de 1944; que le han dicho que sus hijas, que son dueñas de vacas, le venden leche a Tirado y que también le venden otras personas; que él no ha tenido ninguna clase de negocios con Tirado. El Fiscal le exhibe cinco cheques expedidos por el Municipio a favor de José Tirado, por varias sumas, en pago de leche suministrada al Hospital Municipal durante los meses de agosto, septiembre, noviembre y diciembre de 1944 y en abril, mayo y julio de 1945. Todos dichos cheques aparecen endosados por José Tirado y por el querellado Bonocio Campos Segundo. El querellado admitió que la firma que aparece en los cheques es la suya. Los cheques fueron admitidos en evidencia.

Continuó declarando el querellado: que fué la Administradora del Hospital la que le dijo que Tirado era quien su-

plía la leche; que él nunca contrató con Tirado y que el contrato lo hizo la Administradora; que como Alcalde él firmaba los comprobantes, incluso los de Tirado; que le parece que desde hace tiempo la leche se pagaba a catorce centavos; que no sabía cuál era el precio fijado por la O.A.P., pues la Administradora era quien se encargaba de eso.

José Tirado Rodríguez, declaró que en agosto de 1944 compró a Bonocio Campos, hijo del Alcalde de Barceloneta, un establecimiento comercial; que en noviembre del mismo año vendió dicho establecimiento a una hija del Alcalde; que desde el mes de agosto de 1944 empezó a hacer negocio con el Municipio, vendiéndole leche a catorce centavos el litro; que continuó ese negocio hasta noviembre de 1944; que después de vender el negocio a la hija del Alcalde, siguió vendiendo leche al Municipio a 14 centavos; que la leche se la proveía el hijo del Alcalde, a quien él conoce como Bonocio Campos Segundo, a doce centavos el litro; que todavía seguía haciendo ese negocio; que la leche la va a buscar el peón del hospital al cafetín que antes era del Alcalde y ahora es de su hija Iris Esther Campos; que la hija del Alcalde es la que le vende a él la leche a doce centavos, pero que él no sabe la cantidad que ella manda al hospital; que él no paga al peón que lleva la leche ni provee las garrafas para llevarla; que él sabe la cantidad de leche tomada mensualmente por la relación mensual que le da el hospital.

Repreguntado por la defensa, declaró: Que fué la Administradora del Hospital quien le habló para hacer el contrato de leche; que desde entonces ha venido sirviendo ocho litros diarios, los cuales compra a la hija del Alcalde; que antes compraba a otras personas; que el declarante es el que se beneficia directamente con ese contrato y que el Alcalde no tiene ningún interés en ese negocio.

A preguntas del Fiscal, contestó: que el Alcalde sabía que él compraba la leche a su hija a 12 centavos y se la vendía al hospital a 14 centavos litro; que él sabe que lo que

el hospital toma diariamente es 8 litros, porque se lo dicen; que lo único que él hacía era cobrar el dinero por el negocio que tenía con el municipio; que con los cheques que recibía del Municipio compraba en la tienda de la hija del Alcalde y pagaba con los cheques.

Jesús M. Rivera, Secretario-Auditor Municipal, declaró: que en unión del Alcalde firmaba los libramientos de pago para la leche del hospital; que las facturas les eran entregadas unas veces por Tirado y otras por el Alcalde.

El Fiscal ofreció el reglamento de la oficina de Administración de Precios, que fija en 12 centavos por litro el precio de la leche suministrada a los hospitales.

Haremos ahora un resumen de la evidencia ofrecida por la defensa.

Los testigos Mario Olmo Ferrán, agricultor, Bernardo Soler, Administrador Interino de la Central Plazuela, y Blanca M. Marchán, poetiza, se limitaron a declarar que el querellado goza de buena reputación en la comunidad de Barceloneta.

Ramonita de Jesús declaró: Que fué administradora del Hospital Municipal desde el año 1941 hasta julio de 1945; que fué ella quien habló con José Tirado para ver si él le podía suministrar la leche para el hospital; que todo lo que fuera sobre alimentación le tocaba a ella como Administradora; que no habló en ningún momento con el Alcalde sobre el negocio de la leche porque él no acostumbraba hacer los negocios; que desde julio de 1944 a julio de 1945, cuando ella renunció el cargo, quien suministró la leche fué Tirado.

A preguntas del Fiscal, contestó: que no fué el Alcalde quien la autorizó para hacer el contrato de la leche y sí el Director de Beneficencia, Dr. Bernal; que la leche la mandaba a buscar al establecimiento que Tirado tenía en los bajos de la casa del Alcalde; que no sabe si el establecimiento era de Tirado o del Alcalde, pero a quien ella compraba la leche era a Tirado.

, Julio Martínez de Andino, ingeniero de Area y Campo del P.E.G. declaró: que fué ingeniero del distrito de Arecibo y como tal le tocaba supervisar la terminación del proyecto del Camino Bocas; que en marzo de 1944 el Alcalde Campos sometió al P.E.G. un proyecto por la cantidad de $18,000; que el declarante preparó el proyecto; que en febrero 28 de 1945 se paralizó el trabajo de los obreros por haberse agotado los fondos, pero se siguió recibiendo material para la obra, la cual no quedó paralizada en su totalidad; que el proyecto se paralizó al llegar a un puente que no resistía el peso de un rolo de diez toneladas, el cual no podía pasar por otro sitio; que en una ocasión el Alcalde Campos, en compañía de Tomás Dávila, estuvo tratando de ver si los sobrantes del Camino Bocas se podían utilizar en el Camino Piche, y durante la conversación el Alcalde le dijo a Dávila que ellos podían utilizar el sobrante y con el dinero procedente del donativo de $800 de Plazuela hacer el Camino Piche.

Repreguntado por el Fiscal, contestó: que las cantidades asignadas para el proyecto fueron, $18,000 del P.E.G. y $2,000 del Municipio auspiciador; que se asignaron $6,500 para jornales, $1,500 para supervisión y $10,900 para materiales; que la partida para jornales no llegó a agotarse porque el proyecto sólo estuvo en ejecución una semana; que el proyecto auspiciado por el P.E.G. y el Municipio, a la semana de estarse trabajando en él fué sustituído por otro proyecto del Departamento del Interior, que se basa en los mismos números; que en el nuevo proyecto el Departamento del Interior contribuía con los $2,000 que el Municipio había ofrecido para el proyecto original; que el declarante continuó encargado de la supervisión del proyecto; que fué después de continuar la obra bajo el nuevo proyecto que se agotó la partida para jornales, debido a que el Departamento del Interior recomendó que el camino se hiciera de 4½ metros de ancho, o sea un metro más que lo que fijaba en el pro-

yecto original; que fué necesario suspender la obra, por haberse agotado la partida para jornales, desde febrero 28 a marzo 23, 1944; que la única vez que el Alcalde le habló del donativo de la Plazuela fué durante la conversación con Dávila; que después que el Departamento del Interior auspició el proyecto, el Municipio ya no tenía nada que ver con el mismo.

Antonio Rodríguez Avilés, dueño de una bomba para la venta de gasolina, declaró que le vende gasolina al Municipio; que durante el mes de octubre de 1944 despachó gasolina a Israel Núñez por orden del Alcalde; que no puede precisar las fechas, pero se la despachó en el mes de octubre; que a fin de mes envía al Auditor la cuenta, con los vales expedidos por el Municipio cada vez que se despacha gasolina; que no sabe la fecha específica en que despachó la gasolina, pero que eso se puede comprobar con los vales. El testigo no pudo asegurar categóricamente que durante la primera quincena de octubre le despachara gasolina a Israel Núñez.

Terminada la prueba de la defensa, el Fiscal presentó la siguiente prueba testifical:

Bonocio Campos Segundo, el Alcalde querellado, declaró que ha desempeñado el cargo de Alcalde desde el año 1940 hasta que fué suspendido de empleo y sueldo por la Asamblea, con motivo de esta querella; que conoce al Sr. Miguel J. Arzuaga, administrador de la Central Plazuela, quien se encuentra en Europa; que en un día de septiembre de 1944, en su carácter de amigo y no como Alcalde, se entrevistó con Arzuaga con el propósito de conseguir mil dólares para la reparación del camino municipal "Bocas"; que el trabajo se iba a hacer bajo la dirección del P.E.G. y del declarante en su carácter de amigo y cooperador del pueblo y amigo de Arzuaga; que lo que él tenía que hacer era administrar el donativo de la Central; que ese donativo le fué hecho a él personalmente y no al Municipio de Barceloneta; que él fué

al P.E.G. a decirles que querían arreglar el camino y que esa gestión la hizo como Alcalde; que el Director del P.E.G. le dijo que tenía que conseguir un donativo para que el Plan de Emergencia pudiera hacerse cargo de la obra; que como el Municipio no tenía dinero, él habló con el Sr. Fano Vanga y con el Administrador de Plazuela y les pidió un donativo de mil dólares; que esa gestión la hizo en su carácter personal y no como Alcalde; que entonces, antes de octubre, 1944, fué al P.E.G. y les informó que ya tenía un donativo de una entidad particular; que él sometió un proyecto al P.E.G. en marzo de 1944 cuando creía que el Municipio tenía dinero para la obra; que en ese proyecto el Municipio se comprometía a contribuir con $2,000; que cuando el Departamento del Interior hizo el donativo de dos mil dólares, del 10 al 16 de septiembre de 1944, ya él tenía en su poder los dos cheques de Plazuela, por $400 cada uno, y "entonces los ochocientos pesos yo los guardé"; que el camino se arregló con fondos del P.E.G. y del Departamento del Interior, exclusivamente; que en diciembre de 1944 o enero de 1945 fué que se enteró de que el Departamento del Interior había dado una contribución para seguir la obra. El testigo identificó los dos cheques que recibiera de manos del Adminisdor de Central Plazuela, en las fechas en los mismos indicadas, repitiendo que los recibió en su carácter personal y no como Alcalde. Al margen de cada uno de los cheques se hace constar que es una "contribución para construcción carretera La Boca".

Continuó declarando que cobró cada uno de dichos cheques algunos días después de recibirlos y depositó el dinero en su casa y en su caja de seguridad mientras se podía utilizar; que no depositó el dinero en la Caja del Municipio porque el Sr. Arsuaga no se lo dió para entregarlo al Municipio y sí para gastarlo en la obra si era necesario; que conoce el Reglamento que exige que los donativos al Municipio se ingresen en el Tesoro Municipal, pero que eso es

aplicable solamente cuando el donativo se hace al Municipio para una obra municipal y no es aplicable cuando el donativo lo da una persona particular, no al Municipio, y sí para cualquier proyecto, si el donante no exige que el dinero se ingrese en los fondos municipales; que la Central lo hizo a él responsable personalmente del dinero y que por eso él no lo ha tocado; que no recuerda ni sabe si en noviembre 8 de 1944, fecha en que recibió el segundo cheque, ya el Departamento del Interior se había hecho cargo de la obra; que cuando recibió el segundo cheque no había gastado ni un solo centavo de los primeros cuatrocientos dólares; que aceptó el segundo cheque esperando que el P.E.G. le pidiera el material que él se había comprometido a dar para la obra; que sabe que cobró los dos cheques juntos; que no recuerda si los cambió juntos; que no recuerda si comunicó al P.E.G., al Tesorero Municipal o a la Asamblea que había recibido un donativo; que cuando depositó el dinero en su caja no le puso ninguna marca o nota para que pudiese ser identificado como donativo de Plazuela para el propósito ya indicado.

Habiendo el testigo manifestado el deseo de explicar algo, se le permitió que lo hiciera y dijo:

"Mandé buscar el dinero que se envolvió de esos ochocientos pesos, que todavía está en la caja, en el sobre, que yo lo eché del Banco y que yo lo devolví de mi cuenta particular o de mi cuenta corriente a la Central Plazuela. Yo mandé a buscar ahora el paquete de dinero para que Ud. lo vea, para que lo examine y vea cómo está el dinero."

Continuó declarando que sus hijas sabían que los $800 que había en la caja eran el donativo de la Central y que por eso no tomó precauciones para caso de su muerte; que él devolvió el dinero a Plazuela, en octubre 6 de 1945, cuando ya el investigador de Auditoría había iniciado una investigación; que es cierto que él envió su renuncia al Gobernador, pero no porque le tuviera miedo a los cargos y sí por la petición de sus amigos y de Muñoz Marín.

En el mismo acto la defensa presentó a la Asamblea el sobre que contenía los $800, en 40 billetes de $20. El Alcalde declaró que ésos eran los mismos billetes que recibió del banco; y que él devolvió el dinero a Plazuela en un cheque, para poder traer los billetes ante la Asamblea y probar con ellos que él no había usado el dinero.

El Fiscal presentó como su testigo principal al propio Alcalde querellado, quien declaró extensa y detalladamente en contestación a un largo interrogatorio de sus acusadores tendiente a conseguir que el testigo hiciera admisiones incriminatorias. Los conflictos entre lo declarado por el querellado, testigo del Fiscal, y lo declarado por los demás testigos de cargo, y los resultantes de toda la evidencia considerada en conjunto, fueron resueltos por la Asamblea Municipal dando crédito a lo declarado por el querellado y por sus testigos. No encontramos razón alguna que pudiera justificar nuestra intervención con el fallo de la Asamblea, la cual vió y oyó declarar a los testigos y estuvo en mejores condiciones que nosotros para poder juzgar en cuanto a su credibilidad.

*Aun cuando opinamos que la resolución de la Asamblea Municipal debe ser confirmada, queremos hacer constar que esa confirmación no debe ser interpretada en modo alguno como una aprobación por parte de este Tribunal de las actuaciones del Alcalde querellado en relación con los hechos expuestos en los cargos que le fueran formulados.*