JESÚS T. PIÑERO, GOBERNADOR DE PUERTO RICO, querellante y apelante, *v.* ANDRÉS GRILLASCA, ALCALDE DE PONCE, querellado y apelado.

Núm. 17.—*Sometido:* Noviembre 17, 1947. *Resuelto:* Diciembre 19, 1947.

910

*Hon. Procurador General Luis Negrón Fernández, Ángel Umpierre y Guillermo Gil, Procuradores Generales Auxiliares y José C. Aponte, Fiscal Especial General,* abogados del apelante; *Francisco M. Susoni, Hijo, y Cayetano Coll Cuchí,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

El artículo 29 de la Ley Municipal(¹) provee que la Asamblea Municipal podrá destituir al Alcalde de un municipio por causa justificada mediante cargos formuládosle por el Gobernador. Éste formuló diecisiete cargos a Andrés Grillasca, Alcalde de Ponce. Luego de una vista en los méritos, la Asamblea Municipal desestimó por unanimidad todos los cargos, y el Gobernador ha apelado.

### I

El primer cargo imputa a Grillasca el tener un interés directo e indirecto en ciertos contratos celebrados entre el Municipio y la firma García & Cintrón, por compra de

(¹)Ley núm. 53, Leyes de Puerto Rico, 1928 (pág. 335), según fué enmendada por la sección 1 de la Ley núm. 288, Leyes de Puerto Rico, 1946. ((1) pág. 675).

piedra triturada y gravilla, en violación del artículo 10 de la Ley Municipal y de los artículos 202 y 203 del Código Político.(²)

El supuesto interés de Grillasca en estos contratos está predicado en haber firmado en 1943, en unión de Luciano Martiniano García y Juana Clavell, un pagaré a la orden del Banco de Ponce con motivo de un préstamo por $17,500. El producto de este préstamo fué empleado por García & Cintrón para adquirir los bienes de la Atlantic Ore Co., la que explotaba una cantera de donde procedía la piedra y la gravilla envueltas en los contratos.

El pagaré fué firmado por Grillasca y los otros como deudores solidarios. Sin embargo, la Asamblea Municipal resolvió como cuestión de hecho que Grillasca había firmado como fiador de García. Esta conclusión está ampliamente sostenida por la prueba y por los libros del banco. No podemos, según sostiene el apelante, hacer caso omiso de esta conclusión ante la prueba incontrovertida de que Grillasca, si bien técnicamente es un deudor solidario, como cuestión de hecho es un fiador de García. En verdad, esta conclusión es inevitable en vista del hecho no controvertido de que García & Cintrón recibieron el dinero e hicieron más tarde los pagos parciales del préstamo.

La Asamblea Municipal también resolvió que al momento en que Grillasca suscribió el pagaré él no sabía que el préstamo se hacía con el fin de que García & Cintrón pudieran usar su producto para comprar los bienes de la Atlantic Ore Co. La Asamblea Municipal asimismo concluyó que Grillasca no sabía que el dinero se empleó en esta forma hasta después de constituída la firma de García & Cintrón. Empero, Grillasca sabía por supuesto desde 1943 al 1947 cuando se le

(²)El artículo 10, tal como figura en la Ley núm. 253, Leyes de Puerto Rico, 1946, provee que un Alcalde incurrirá en *misdemeanor* si "está interesado directa o indirectamente, en contratos celebrados con un municipio...". Este artículo ha dispuesto esto desde que fué originalmente aprobado. El artículo 202 del Código Político contiene una prohibición similar.

adjudicaban estos contratos a García & Cintrón, que el producto del préstamo del cual él era fiador fué usado para constituir la firma de García & Cintrón.

En vista de estos hechos, la cuestión a determinarse aquí no es si el artículo 10 de la Ley Municipal prohibe al Alcalde servir de fiador en relación con un contrato específico entre un vendedor y el municipio. Esa cuestión surgiría si, por ejemplo, el Alcalde fuera fiador para garantizar a un vendedor en el cumplimiento de un contrato. Aquí la cuestión es más bien si el Alcalde tiene un interés directo o indirecto dentro del alcance del artículo 10 en un contrato entre el Municipio y una firma bajo las siguientes condiciones: (1) el Alcalde era fiador en un préstamo corriente héchole a uno de los socios de la firma; (2) el préstamo corriente se hizo antes de que se celebraran los contratos entre el Municipio y la firma; (3) el préstamo corriente en manera alguna estaba relacionado con los contratos específicos entre el Municipio y la firma.

Tal cuestión nunca ha sido resuelta en esta jurisdicción. Los casos citados por el apelante no son aplicables. En ellos se estableció claramente que el Alcalde tenía un interés pecuniario directo en los contratos específicos. *Pueblo ex rel. Pérez* v. *Manescau*, 33 D.P.R. 739; *Díaz* v. *Charneco*, 48 D.P.R. 536; *Asamblea Municipal* v. *González, Alcalde*, 55 D.P.R. 542, 558–9.

El apelante también descansa en cuatro casos de otras jurisdicciones; v.g., *Lesieur* v. *Inhabitants of Rumford*, 93 A. 838 (Me., 1915); *James* v. *City of Hamburg*, 156 N.W. 394 (Ia., 1916); *City of Lincoln* v. *First Nat. Bank*, 19 N.W. 2d 156 (Neb., 1945); y *Matter of Clamp*, 33 Misc. Rep. 250 (1900). Tampoco estos casos resuelven nuestro problema. En primer lugar, la cuestión en ellos envuelta fué si los contratos eran válidos, y no si los funcionarios públicos de que se trataba debían ser destituídos. En segundo lugar, envolvían situaciones en que el funcionario tenía una conexión di-

recta y específica con el contrato propiamente dicho, y no eran como éste en que el Alcalde sirvió de fiador al vendedor en un préstamo corriente independiente de los contratos celebrados entre el vendedor y el Municipio. Finalmente, el caso de *Matter of Clamp* fué resuelto a tenor con un estatuto de Nueva York que disponía que un funcionario público no tendrá interés directo o indirecto en ningún contrato con el Gobierno "ya sea como principal, como fiador o en ninguna otra forma...". El artículo 10 no le prohibe específicamente al Alcalde servir de fiador en tal contrato.

Suponiendo, sin decidirlo, que resolviéramos, no obstante la ausencia del lenguaje específico contenido en el estatuto de Nueva York, que el artículo 10 prohibe al Alcalde servirle de fiador a un vendedor en un contrato celebrado entre éste y el Municipio, ello sin embargo no contesta la pregunta de si un Alcalde puede no obstante, como ocurrió en este caso, servir de fiador a un vendedor en un préstamo corriente que en manera alguna está relacionado con los contratos celebrados entre el vendedor y el Municipio.

Las partes no han citado casos sobre este punto. Los más semejantes que hemos encontrado son aquéllos que tratan el problema de si estatutos como el artículo 10 son de aplicación a un caso en que el funcionario público es un acreedor corriente del vendedor más bien que su fiador. Los casos están divididos sobre la cuestión de si los contratos entre el vendedor y el Municipio están prohibidos bajo tales circunstancias. Anotación, 73 A.L.R. 1352.

Nos damos cuenta de los factores existentes a ambos lados de este problema. Como cuestión de política pública, el Alcalde quizá estaría tentado a favorecer a un vendedor que le debiera dinero por alguna otra transacción independiente y privada. Sin embargo, algunos de los casos resuelven que este peligro es remoto y que el estatuto sólo se aplica cuando el interés del Alcalde es real y pecuniario.

No es necesario que resolvamos ahora qué regla seguiríamos. Aquí no se impugna la validez de los contratos. En

verdad, si ésta se impugnara ahora, Grillasca podría alegar que, aun si resolviéramos que el Alcalde no puede otorgar contratos a un vendedor si aquél es un acreedor corriente de éste, aquí el Alcalde ocupaba una posición más remota: era fiador general, no acreedor corriente de García & Cintrón. Además, la transacción fué con un socio particular, y no con la firma vendedora. De todos modos, podría suceder que tratándose de una cuestión difícil de derecho, quizá en última instancia se concluyera, de surgir la cuestión alguna vez, que los contratos entre García & Cintrón y el Municipio eran nulos, simplemente porque el Alcalde sirvió de fiador a García en un préstamo que no tenía relación alguna con los contratos celebrados entre el Municipio y García & Cintrón. Pero en ausencia de una actuación maliciosa y voluntaria de parte del Alcalde, cosa que según resolvió la Asamblea Municipal, no hubo en este caso, no podemos concluir que debe destituirse al Alcalde porque en alguna fecha futura podamos resolver que él decidió incorrectamente una difícil cuestión de derecho, sobre la cual otros tribunales están divididos y que todavía no ha sido resuelta por nosotros. Véase el escolio 6.

## II

El segundo cargo es al efecto de que a virtud de los referidos contratos el Alcalde creó un monopolio a favor de la firma García & Cintrón, compuesta de García, cuñado del Alcalde, y de Cintrón, hijo menor de Juana Clavell, Tesorera-Directora Escolar de Ponce. Antes de discutir este cargo, pasemos al próximo grupo de éstos.

Los cargos tercero al décimo imputan que en distintas fechas, sin la celebración de subastas, según exige el artículo 8 de la Ley Municipal, el Alcalde compró a García & Cintrón para el Municipio, piedra triturada y gravilla, con un valor sobre $2,000, para usarse en el proyecto de pavimentación de las calles de Ponce y en otras obras municipales. Algunos de estos cargos expresan que se expidieron varias órdenes el mismo día para los mismos materiales por cantidades menores

de $2,000, pero que ascienden en total a más de $2,000, con la intención de evadir los requisitos del artículo 8.([3])

El Alcalde indudablemente aprobó el pago de piedra triturada y gravilla comprada a García & Cintrón por un importe mayor de $2,000 sin la celebración de subastas, usadas en el proyecto de construcción y pavimentación de las calles de Ponce.([4]) Para poder determinar si esta actuación del Alcalde violó el artículo 8, pasemos primeramente a la cuestión de si este proyecto era una "obra pública" del Municipio dentro del contexto del artículo 8.

El proyecto para la pavimentación de las calles de Ponce fué originalmente un proyecto Federal de la WPA. Cuando desapareció la WPA el proyecto vino a manos del Programa de Emergencia de Guerra del Gobierno Insular, conocido como el PEG. Véase la Ley núm. 16, Leyes de Puerto Rico, 1942 (pág. 51), Tercera Sesión Extraordinaria. El problema de si como cuestión de derecho el proyecto era insular o municipal es difícil de resolver. Quizá se podría clasificar mejor como un proyecto híbrido. En verdad, no era uno exclusivamente municipal. *Cf. Loans from the PWA in Excess of City Debt Limits*, 47 Harv. L. Rev. 688; Foley, *Municipal Financing of Public Works*, 4 Fordh. L. Rev. 13, 15–17, 24–25. Tanto bajo la WPA como bajo el PEG,([5]) el Municipio "auspició" el proyecto. Esto significaba en efecto que el proyecto beneficiaría al Municipio. Sin embargo, en este caso y casi invariablemente la contribución del PEG al costo del proyecto fué considerablemente mayor que la contribución

---

([3])El artículo 8 de la Ley Municipal dispone que "Toda obra pública se verificará y todos los efectos y materiales se adquirirán mediante subasta cuando su valor o costo exceda de dos mil (2,000) dólares en los municipios de primera clase ... ".

([4])Algunos de los cargos decían que parte de la piedra y gravilla era para otros proyectos así como para pavimentar las calles de Ponce. Sin embargo, en su alegato el apelante no sostiene que se compraron materiales por más de $2,000 sin subasta para cualquier proyecto exclusivamente municipal.

([5])Las partes parecen convenir en que el procedimiento bajo el cual el Municipio auspiciaba proyectos de la WPA y del PEG era, para nuestros fines, sustancialmente el mismo. Por tanto, limitamos nuestra discusión al procedimiento bajo el PEG.

del Municipio. Pero el aspecto más significativo del convenio entre el PEG y el Municipio fué que el control y la administración del proyecto, desde su comienzo hasta su terminación, descansaba en el PEG. Aun en los casos en que la contribución del Municipio se hacía en dinero, éste no lo gastaba directamente en el proyecto. Por el contrario, el dinero se le entregaba al PEG y éste lo invertía. Y nadie alega que el PEG venía obligado a invertir tal dinero de conformidad con el artículo 8 de la Ley Municipal, o que el Alcalde venía obligado a hacer que el PEG cumpliera con el artículo 8 al hacer tales inversiones de dinero. En realidad, la sección 3(i) de la Ley núm. 16 de 1942 expresamente autoriza al PEG a prescindir de las subastas en sus proyectos.

El problema es un poco más difícil cuando, como ocurrió en este caso, la contribución del Municipio a un proyecto del PEG se hace en materiales y no en numerario. Cuando se aprobó originalmente el artículo 8, el concepto de un proyecto PEG-municipal era desconocido. Por tanto, se podría argüir que la Asamblea Legislativa, al aprobar el artículo 8, tenía en mente sólo los proyectos planeados, administrados y controlados exclusivamente por el Municipio, y que en su consecuencia el artículo 8 no es de aplicación a este caso. Sin embargo, hay considerable peso en el argumento contrario de que la fraseología usada por la Asamblea Legislativa es absoluta, y que cualquier compra de materiales por el Municipio cuando el costo excede de $2,000 debe hacerse mediante la celebración de subastas. Esta última contención quizá prevalecería si el Municipio estuviera simplemente comprando materiales. Pero ésa no fué la situación en este caso. Aquí se compraron los materiales con el fin de entregárselos al PEG para que éste los usara en un proyecto administrado y controlado por el PEG. Por tanto, la cuestión crucial es la forma en que se determinó la identidad del vendedor de los materiales y el importe de los mismos.

Cuando nos referimos a la prueba sobre esta última cuestión, encontramos que Rafael V. Urrutia, Jefe de la División

de Operaciones del PEG, declaró que cuando el municipio auspiciador convenía en suministrar materiales para un proyecto del PEG, éste informaba solamente la cantidad y calidad de los mismos, y que el vendedor era seleccionado por el Municipio sin intervención alguna del PEG. No obstante, admitió que no tenía conocimiento propio de cómo se adquirieron los materiales para el proyecto de pavimentación en Ponce. En su consecuencia, su declaración fué solamente en cuanto a los reglamentos del PEG en general, y no respecto a la forma en que realmente operaron en este caso.

Por otro lado, Salomón Jorge Elías, quien era el Superintendente del PEG en Ponce para este proyecto, testificó que él y el Alcalde habían llegado a un entendido al efecto de que Elías seleccionaría los vendedores de materiales, ya que éste estaba familiarizado con tales asuntos y el Alcalde no. Declaró que después de la debida investigación llegó a la conclusión que la Atlantic Ore Co. era el único proveedor que podía suministrar la piedra triturada y la gravilla para este proyecto; que por tanto él personalmente eligió a dicha compañía como la vendedora de la piedra triturada y la gravilla para el proyecto; que García & Cintrón, como sucesora de la Atlantic Ore Co., continuó suministrando estos materiales, que no podían adquirirse de ningún otro vendedor; que él personalmente ordenaba los materiales directamente del proveedor cuando los necesitaba; que después que él certificaba haber recibido los mismos, los comprobantes se le enviaban al Municipio para el pago; y que el Alcalde nunca participó en forma alguna en la selección del proveedor o al decidirse qué cantidad de material debía comprarse en cualquier fecha específica. Esta declaración fué corroborada por Edil M. Rivera, Director de Obras Públicas de Ponce.

Alega el apelante que la conclusión de la Asamblea al efecto de que la única función realizada por el Municipio era aportar el costo de los materiales, no está sostenida por la prueba, y que por el contrario, los comprobantes y otra prueba documental demostraron que el Municipio seleccionó

el vendedor. Si descansáramos únicamente en la prueba documental y en los reglamentos del PEG, según los describe Urrutia, la contención del apelante indudablemente estaría correcta. Pero la Asamblea Municipal encontró probado el hecho de que el proyecto no había sido administrado según lo disponían los reglamentos. Resolvió más bien—y la prueba sostiene esta conclusión—que el Superintendente del PEG seleccionó el vendedor y determinó cuándo y cuánto material debía comprarse.

Quizá el Alcalde tenía autoridad legal para insistir en que el Municipio tenía el control de la compra de materiales para el proyecto. Tal vez pudo haber ido más lejos y, para protegerse, insistir en que se compraran los materiales por subasta a tenor con el artículo 8. Pero la declaración de Elías demuestra que el Alcalde era hombre práctico. Sabía que los superiores raras veces cumplen órdenes de sus subalternos. El récord contiene ejemplos de las vicisitudes a que estaban sujetos los proyectos auspiciados antes de que el PEG los terminara. Los fondos o los trabajadores asignados por el PEG para tales proyectos eran súbitamente retirados o reducidos. Además, estos proyectos eran administrados bajo condiciones de guerra; los materiales y la gasolina para el funcionamiento de la maquinaria y transportación eran difíciles de obtener. El Alcalde aparentemente llegó a la conclusión de que la mejor manera de asegurar la terminación del proyecto al menor costo posible era dándole carta blanca al PEG: el Municipio pagaría por los materiales; el PEG determinaría la forma de compra, seleccionaría el vendedor y la cantidad de materiales necesarios en una fecha específica.

Para protegerse a sí mismo, el Alcalde debió haber celebrado por escrito su convenio con el Superintendente del PEG al efecto de que éste seleccionaría el vendedor y la cantidad de materiales. También, su posición sería mejor si hubiera supuesto que el artículo 8 de la Ley Municipal posiblemente era aplicable y, actuando con precaución, hubiera obtenido una ordenanza de la Asamblea Municipal declarando una emer-

gencia en cuanto a los materiales específicos a ser adquiridos de García & Cintrón sin la celebración de subastas, conforme dispone el artículo 8. *Cf. Ortiz v. Palmer,* 61 D.P.R. 677. Pero el Alcalde actuó enérgicamente en tiempos de guerra y emergencia para obtener grandes beneficios para el Municipio sin costo alguno para éste. Y la prueba demuestra fuera de toda duda que el Alcalde no tuvo el menor beneficio personal de estas transacciones, y que como resultado de este sistema de compras el proyecto del PEG en Ponce se terminó a un costo considerablemente menor que proyectos similares del PEG en otros sitios.

El Alcalde corrió el riesgo de que algunas de sus actuaciones pudieran posteriormente declararse técnicamente ilegales. Corrió estos riesgos en pro del Municipio de Ponce. Ahora, con la omnisciencia de hechos consumados, luego de una administración de siete años, una investigación extremadamente minuciosa descubre estas compras de materiales. La Asamblea Municipal ha juzgado al Alcalde de acuerdo con la ley. Ha resuelto que él no se merece el estigma de la destitución. No estamos preparados para decir que los hechos sólo permiten la conclusión contraria cuando tales hechos son que, sobre la difícil cuestión de derecho de si el artículo 8 de la Ley Municipal es de aplicación a un proyecto PEG-municipal, el Alcalde, con el fin de asegurar la terminación del proyecto al menor costo posible, resolvió en efecto que el artículo 8 no era aplicable y permitió que el Superintendente del PEG seleccionara el proveedor de materiales en vez de celebrar subastas para ello. Sobre este particular, debemos tener en mente que si la contribución del Municipio hubiera sido en dinero en vez de materiales, como hemos visto, el PEG hubiera comprado dichos materiales prescindiendo del artículo 8.

Indudablemente hay casos en que la ley es tan clara que debe destituirse al alcalde si deliberada y persistentemente la desafía y se niega a cumplirla. Pero cuando como ocurre en este caso existe una difícil cuestión de derecho y cuando

la decisión del Alcalde resultó en beneficio del Municipio y no envolvió beneficio personal o corrupción de su parte, no podemos ver cómo estaríamos justificados en revocar la resolución de la Asamblea Municipal desestimando tal cargo.([6])

Deseamos enfatizar que no está ante nos la cuestión de si los contratos por estos materiales eran válidos dadas las disposiciones del artículo 8. Sólo resolvemos que, bajo todas las circunstancias concurrentes, la actuación del Alcalde no amerita su destitución.

Considerada nuestra discusión de los cargos 3 al 10, el segundo, al efecto de que el Alcalde creó un monopolio a favor de García & Cintrón, carece de base. Los hechos del caso de *Asamblea Municipal* v. *González, Alcalde,* supra, pág. 559, en que descansa el apelante, son obviamente diferentes a los del presente.

### III

■■ Los cargos 11, 12 y 13 son al efecto de que Fernando Sánchez, Director y Químico de la Planta de Filtración del Acueducto de Ponce, Edil M. Rivera, Director de Obras Públicas, y Herminio Echevarría, ex Secretario Municipal y Director de Escuela Elemental de Ponce, recibieron pagos en adición a sus sueldos, en violación del párrafo 13 de la sección 34 del Acta Orgánica, 48 U.S.C.A. Sec. 838, y del artículo 177 del Código Político, que prohiben la doble compensación.

En el caso de Sánchez la prueba fué al efecto de que se le pagaban $150 mensuales como Director y Químico del Acueducto de Ponce; que el acueducto y las facilidades auxiliares

---

([6])Notamos de paso que nuestra discusión de los cargos 3 al 10 también se aplica al primero y ofrece un motivo adicional para desestimar éste. Hemos concluído que el artículo 8 de la Ley Municipal no se aplica con tal claridad a los contratos entre García & Cintrón y el Municipio por materiales para los proyectos del PEG, que justifique la destitución del Alcalde por no haber cumplido con el mismo. Igualmente, aún si supusiéramos que la firma del pagaré por el Alcalde como fiador de García dió a éste el interés directo o indirecto provisto por el artículo 10 de la Ley Municipal, estos contratos no son tan claramente contratos municipales, en particular dadas las circunstancias bajo las cuales fueron celebrados, como para justificar la destitución del Alcalde por su participación en su otorgamiento.

del mismo estaban situados fuera de la ciudad; que Sánchez tenía la obligación de inspeccionar estas facilidades; que cuando no se inspeccionaban debidamente, el agua se contaminaba; que le era indispensable un automóvil para cumplir adecuadamente los deberes de inspección; que las autoridades militares estaban preocupadas por el hecho de que el agua del acueducto de Ponce no estaba dentro de las normas requeridas; que para aquel entonces debido a la guerra el Municipio no podía obtener un automóvil para el uso de él; que el Alcalde, luego de consultar con varios miembros de la Asamblea Municipal, convino con Sánchez en que éste usara su propio automóvil para fines oficiales, por lo cual recibiría una suma fija de $75 mensuales para gasolina, reparaciones, depreciación y chófer; y que después de hacerse este convenio y como resultado de sus inspecciones y otros esfuerzos, el agua estuvo dentro de las normas requeridas y las autoridades militares quedaron satisfechas.

El apelante descansa en *López* v. *Martorell,* 59 F. 2d 176 (C.C.A. 1, 1932); *Báiz* v. *Comisión Hípica,* 63 D.P.R. 483; y *Pueblo ex rel. Castro* v. *Padrón,* 60 D.P.R. 798. Ninguno de estos casos es de aplicación. Ellos envuelven doble compensación por servicios propiamente dichos. Aquí el problema es si el reembolso por gasolina y uso del automóvil del empleado constituye una violación del párrafo 13 y del artículo 177. En dichos casos no se consideró esa cuestión.

Las estrictas disposiciones de la ley que prohiben doble compensación no pueden evadirse mediante subterfugios. Pero las circunstancias del presente caso demuestran la imperiosa necesidad de conseguirle a Sánchez un automóvil oficial, la imposibilidad del Municipio de obtener uno por razón de la guerra y el uso de su propio automóvil, incluyendo los gastos de gasolina, para tal fin. Indudablemente hubiera sido más deseable que el Municipio le reembolsara a Sánchez los gastos exactos en vez de pagarle una suma fija mensualmente. Mas es práctica corriente en el Gobierno Federal, por ejemplo, reembolsar a los empleados que usan sus propios

automóviles para fines oficiales, una suma fija por milla recorrida en vez de exigirles que lleven cuentas detalladas y laboriosas de sus gastos. Si Sánchez usó su automóvil constantemente para fines oficiales, ciertamente la cantidad de $75 mensuales no puede decirse que sea enteramente irrazonable como un estimado de sus gastos.

No nos detendremos a determinar si este método de reembolso estaba. de acuerdo con la práctica ordenada por el Auditor. Suponiendo que no lo estuviera, esa mera irregularidad difícilmente justificaría la destitución del Alcalde.

A no ser por diferencias insignificantes en cuanto a detalles, los hechos envueltos en los pagos efectuados a Rivera son similares a los del caso de Sánchez. Por tanto, es innecesario que hagamos comentario adicional alguno sobre los mismos.

En cuanto a Echevarría, éste había sido Secretario del Municipio. Dejó ese cargo para irse a trabajar con el Departamento de Instrucción insular. No había nadie preparado que pudiera hacer parte de su trabajo anterior. Por tanto, trabajó fuera de horas de oficina para el Municipio durante los meses de mayo y junio de 1945 y por ello recibió dos pagos de $60 cada uno.

La Asamblea Municipal llegó a la conclusión que el valor de sus servicios excedía la suma pagádale. También resolvió que el Departamento de Instrucción "había reconocido el derecho de los empleados de la categoría del Sr. Echevarría a hacer estas clases de trabajo y cobrar por ellos en horas fuera de las de su empleo en el Gobierno Insular".

El apelante no comenta en su alegato esta última conclusión de la Asamblea Municipal. Si la aceptamos como cierta, el Alcalde no cometió acto impropio alguno, irrespectivamente de la legalidad de tal trabajo y compensación dobles. Y aun suponiendo que el Departamento de Instrucción no hubiera autorizado tal práctica y que era ilegal que el empleado cobrara por dicho trabajo, cf. *López* v. *Martorell*, supra, difícilmente creemos que deba destituirse al Alcalde

por el mero hecho de haber traído a un ex empleado a prestar servicios temporales y urgentes mediante una modesta compensación.

## IV

El cargo décimocuarto es que el Alcalde aprobó una cuenta de $325 en pago de los servicios profesionales de un contador público autorizado, que fué cargada indebidamente a la partida "Servicios de un Secretario y Asesor Legal del Alcalde".

La Asamblea resolvió que la cuenta por dichos servicios era razonable; que el Alcalde no tuvo participación en cargar la cuenta a ninguna partida específica, cosa que se hizo posteriormente por el Auditor Municipal; que de cualquier modo, esto fué un error oficinesco que luego pudo haberse corregido en los libros del Municipio; y que tales correcciones eran comúnmente hechas en los libros de todos los municipios, de los departamentos insulares y de la Auditoría de Puerto Rico.

El apelante no probó que no hubiera partida a la cual cargarse esta cuenta ni que el Alcalde hubiera contratado los servicios del contador con la intención deliberada de pagarle de una partida indebida. La única prueba fué que la cuenta se pagó con cargo a otra partida. Y, según el apelante, ya es muy tarde para corregir el error, por haber expirado el año en cuestión.

Suponiendo que la cuenta se cargase a una partida indebida, el error no fué cometido por el Alcalde. Además, el corregir tal error es uno de los pequeños deberes del Auditor Municipal mas no del Alcalde. El afirmar que un cargo de esta naturaleza justifica la destitución del Alcalde de Ponce sería convertir en trivial el procedimiento provisto por el artículo 29 de la Ley Municipal. Ningún funcionario importante de cualquier gobierno permanecería en su cargo veinticuatro horas si se le pudiera destituir por cualquier error oficinesco de poca monta cometido por uno de sus subalternos.

## V

██ La sección 1 de la Resolución Conjunta núm. 57, Leyes de Puerto Rico, 1925 (pág. 1135), autorizó al Municipio de Ponce para que construyera un malecón en la bahía de Ponce en cooperación con el gobierno Federal. La sección 2 "autoriza [al Gobernador] . . . a traspasar al Municipio de Ponce el título de propiedad de todos los terrenos que se desequen y se ganen al mar por virtud del dragado de dicho puerto".

El cargo décimoquinto es que el Alcalde sabía que 35.506 cuerdas de cierta parcela de terreno no se habían ganado al mar de conformidad con la Resolución Conjunta 57, sino que pertenecían a la Autoridad de Fuentes Fluviales; que eso no obstante en marzo de 1946, y mediante información falsa, el Alcalde obtuvo del Comisionado del Interior una certificación acreditativa de que 40.411 cuerdas habían sido desecadas y ganadas al mar; que esto se hizo con el fin de obtener la inscripción de dicha parcela a nombre de El Pueblo de Puerto Rico, y luego obtener del Gobernador el traspaso de dichas 40 cuerdas al Municipio de Ponce, en armonía con la Resolución Conjunta núm. 57; que el Alcalde logró inscribir esta parcela a nombre de El Pueblo de Puerto Rico; y que el 25 de marzo de 1946, el Alcalde logró obtener una escritura otorgada por el Gobernador transfiriéndole dicha parcela al Municipio.

La prueba demuestra que en 1945 el Alcalde inició sus esfuerzos para establecer el interés del Municipio en esta parcela de terreno. Contrató los servicios de una reconocida firma, Frank Rullán Associates, para que hiciera la mensura del terreno a fin de determinar sus colindancias. La firma asignó esta tarea a Frank Gatell, uno de sus empleados. Éste examinó un plano del Departamento de la Guerra; discutió la cuestión con Angel Sacarello, Jefe del Negociado de Muelles y Puertos del Departamento del Interior; vió un plano en el Negociado de Terrenos Públicos del Departamento del

Interior; y para examinarla volteó la parcela en sí. Entonces preparó un plano de los terrenos en cuestión.

El Alcalde utilizó el plano suministrádole por Frank Rullán Associates para obtener del Departamento del Interior una certificación demostrativa de que la parcela había sido ganada al mar de conformidad con la Resolución Conjunta 57. Dicha certificación es la clave de este cargo. A base de ella y a solicitud del Alcalde, se inscribió primeramente la parcela a nombre de El Pueblo de Puerto Rico y luego de aprobada por el Procurador General en cuanto a su forma, fué traspasada por el Gobernador al Municipio de Ponce. El caso contra el Alcalde, en su consecuencia, para que se sostenga o caiga, depende de que él deliberadamente engañara al Departamento del Interior al obtener esta certificación.

La única evidencia ofrecida por el apelante, en apoyo de su imputación de fraude al Alcalde, fué la declaración de Sacarello. Éste declaró en síntesis que ordenó se librara la certificación solicitada por el Alcalde debido únicamente a que Grillasca le aseguró que la parcela había sido realmente ganada al mar en virtud de los trabajos hechos a tenor con la Resolución Conjunta núm. 57. Pero la Asamblea Municipal no quiso dar crédito a esta declaración de Sacarello. Toda vez que la Asamblea Municipal vió y oyó al testigo, ella era el mejor juez de su credibilidad. No vemos base alguna por la cual podamos resolver que la Asamblea Municipal venía obligada a creer a Sacarello. Véase *Tugwell, Gobernador,* v. *Campos,* 65 D.P.R. 660.

Por el contrario, aun si actuáramos sin el beneficio de la conclusión de la Asamblea, nos sería muy difícil creer que un alto funcionario del gobierno insular daría un paso tan importante fundado en el mero *ipse dixit* de una persona que representa una entidad con intereses en conflicto, sin antes hacer una investigación independiente para proteger los intereses del gobierno insular. En verdad, Sacarello admitió que hubiera sido mejor que él hubiera hecho una inspección de la parcela. Y Armando Morales, Ingeniero Director del Ne-

gociado de Terrenos Públicos del Departamento del Interior, donde se preparó la certificación, controvirtió la declaración de Sacarello de que éste había descansado únicamente en las afirmaciones de Grillasca. Morales declaró que cuando Sacarello vino con Grillasca y su abogado donde él para que preparara la certificación, Morales preguntó si "esto ha sido certificado por el Inspector de Ponce". Sacarello contestó, "No, señor; ha sido por mi oficina...". Morales también declaró como sigue: "...¿El Sr. Sacarello, cuando le dió la información, le dijo que la había adquirido del Sr. Alcalde o de los Jefes de su Departamento?" "De los Jefes, y de un plano del Sr. Rullán."

Pero aun si admitiéramos que la declaración de Sacarello era cierta, eso no demuestra necesariamente que el Alcalde sabía que estaba haciendo una reclamación falsa. A lo sumo revela que Sacarello fué negligente al no proteger los intereses del gobierno insular cuando ordenó se librara la certificación sin investigar los méritos de la reclamación del Alcalde. Indudablemente el Alcalde insistió en que Sacarello le expidiera la certificación. Pero de los autos se desprende que la reclamación del Alcalde fué hecha de buena fe, aunque como cuestión de hecho y de derecho pudo ser o no una reclamación errónea.

El récord demuestra que en la actualidad existe una controversia *bona fide* respecto a si esta parcela está cubierta por la Resolución Conjunta núm. 57. Gatell declaró que encontró que durante la marea alta dicha parcela estaba en parte sumergida y que en parte era manglar; pero no pudo decir si antes de eso había sido ganada al mar alguna vez. Y al presente está en controversia el hecho de si toda o parte de la parcela fué ganada al mar hace algunos años bajo la Resolución Conjunta núm. 57.

La Asamblea Municipal no decidió esta controversia. Tampoco la resolveremos nosotros en este recurso. Eso debe determinarse en un procedimiento plenario. Pero de los autos ante nos no surge fraude por parte del Alcalde al

hacer la reclamación del Municipio. Es cierto que hizo esfuerzos extraordinarios para establecer una reclamación que sus predecesores habían descuidado durante un número de años. Pero su celo a este respecto debe encomiarse más bien que censurarse.

Durante muchos años funcionarios estatales no solamente habían afirmado que los terrenos sumergidos a lo largo de sus áreas costaneras pertenecían a sus estados y no al Gobierno Federal, si que también habían ejercido actos de dominio sobre dichos terrenos. La Corte Suprema recientemente decidió que los Estados Unidos han tenido siempre pleno dominio y control sobre estos terrenos. *United States* v. *California*, 332 U.S. 19. Pero nadie ha sugerido que aquellos gobernadores que en representación de sus estados asumieron esta posición errónea deban ser residenciados.

Si la reclamación del Municipio a esta parcela carece de méritos, las cortes así lo dirán. Pero en ausencia de prueba de fraude, prueba que falta totalmente en este caso, no debe exigirse al Alcalde que su derecho al cargo dependa de la validez de esta reclamación.

## VI

El cargo décimosexto es que desde 1942 a 1946 el Alcalde, sin el consentimiento de la Asamblea Municipal según lo exige el artículo 29 de la Ley Municipal, le pagó $150 mensuales por servicios profesionales a Francisco M. Susoni, quien no era abogado del Municipio.

La prueba demostró que el Alcalde celebró un contrato verbal con Susoni para que éste actuara como abogado del Municipio por $150 mensuales; que Susoni prestó valiosos servicios, por los cuales recibió la suma estipulada; que en 1945 el contrato verbal se formalizó por escrito; y que la Asamblea Municipal no participó al emplearse a Susoni como abogado de ella.

El artículo 29 no dice que el Alcalde no puede nombrar un abogado para el Municipio sin el consentimiento de la

Asamblea Municipal. Más bien dispone que "En ningún procedimiento . . . en que sea parte el Municipio . . . podrá el Alcalde . . . retribuir los servicios de un abogado *que no sea el del Municipio*, sin consentimiento de la Asamblea Municipal." (Bastardillas nuestras). Véase *Valldejuli* v. *Municipio*, 43 D.P.R. 41. Aquí el Alcalde empleó a Susoni como abogado regular del Municipio, sin el consentimiento de la Asamblea. El artículo 29 no prohibe eso.

El hecho de que durante este período no existiera una partida titulada "Abogado del Municipio" no afecta la cuestión. Había partidas en los diferentes presupuestos para pagar los servicios de un asesor legal. Esto era suficiente autoridad para el Alcalde emplear y pagar a Susoni como abogado del Municipio. Y aun si no lo fuera, convertiríamos en una burla la disposición del artículo 29 de que un Alcalde será destituído tan sólo por justa causa, si resolviéramos que debe destituirse a Grillasca porque estaba equivocado al creer que podía contratar los servicios de alguien como abogado del Municipio en virtud de la disposición en el presupuesto sobre un asesor legal. Véanse *State* v. *Naumann*, 239 N.W. 93, 95 (Ia., 1931); *State* v. *Meek*, 127 N.W. 1023, 1027 (Ia., 1910).

## VII

El cargo décimoséptimo es que en 1946 el Alcalde autorizó el pago de $10,000 a Francisco M. Susoni por servicios legales especiales en relación con el traspaso al Municipio de la parcela de terreno envuelta en el cargo décimoquinto, a sabiendas de que el Municipio no adquirió título al terreno por no haber sido ésta ganada al mar, según lo exige la Resolución Conjunta núm. 57.

Lo que ya hemos dicho en relación con el cargo décimoquinto es suficiente para resolver éste. Sólo resta agregar que cuando Susoni le escribió una carta al Alcalde solicitando compensación por estos servicios especiales, el Alcalde refirió la carta a la Asamblea Municipal. Ésta, por una resolución

formal, en la cual no intervino el Alcalde, fijó los honorarios en cuestión. No podemos ver cómo el cumplimiento por el Alcalde de dicho mandato de la Asamblea Municipal pueda dar lugar a que ésta lo destituya.

*La decisión de la Asamblea Municipal desestimando los cargos será confirmada.*