Salvador Rivera y la Asamblea Municipal de Arroyo, querellantes y apelados, *v.* Hipólito González, Alcalde Municipal de Arroyo, querellado y apelante.

No. 5311.—*Sometido:* Diciembre 23, 1930. *Resuelto:* Enero 30, 1931.

*José Ruiz de Val* y *Fernando Beiró Rovira,* abogados del querellado apelante; *Bolívar Pagán,* abogado de los apelados.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

El alcalde de Arroyo fué residenciado y destituído de su cargo por la asamblea municipal, por los fundamentos consignados en el tercero, el cuarto, el sexto y el séptimo de una serie de cargos, que leen así:

"3.—El citado alcalde autorizó se pagase como se pagó a Alfredo Cintrón, de los fondos públicos del municipio, la cantidad de quince dólares por un viaje político, ajeno al municipio, realizado de Arroyo a San Juan en el mes de mayo de 1929, siendo ese pago en detrimento del municipio.

"4.—El citado alcalde realizó la tentativa de malversar fondos públicos del municipio, autorizando como autorizó que se expidiese una orden de materiales de plomería dirigida a la firma mercantil de Arroyo denominada Juan Covas y Compañía, solicitando como solicitó se entregase como se entregó con cargo a los fondos municipales, los siguientes efectos con cargo a la partida 'Conservación y Reparación del Acueducto', 60 pies de tubería de 2/8 pulgada de diámetro; una llave de paso, una llave de chorro, un T, 6 codos, una unión. Todos estos materiales fueron usados en la casa particular de Eugenio Silva, radicada en el lugar llamado 'Ensanche' y después de haber sido utilizados dichos materiales en la dicha casa, cuando fué acusado ante el Gran Jurado de la Hon. Corte de Distrito de Guayama por tal hecho, mandó a cancelar la orden destruyendo la prueba con la cual se le perseguía, lo cual es un delito penable conforme a las leyes criminales de Puerto Rico. La orden de la toma de los materiales aludidos fué dictada en julio 2 del 1929.

"6.—El citado alcalde no ha rendido al municipio de Arroyo ni al Hon. Gobernador de Puerto Rico el informe anual que ordena la presente Ley Municipal en su artículo 29, habiendo descuidado negligentemente el cumplimiento de su deber. Los precedentes cargos son por la manifiesta negligencia demostrada por el citado alcalde en el desempeño de su ministerio, infligiendo como ha infligido por ello graves perjuicios a este municipio, perjuicios que ya son irreparables.

"7.—El citado alcalde bailaba el día 15 de julio de 1929, en estado de embriaguez, en un baile de mujeres prostitutas, en el lugar denominado Pasto en Arroyo, P. R., exponiéndose a la censura del público y lo que es una tremenda depravación moral, que lo inca-

pacita para el alto cargo que se le confió de alcalde de este pueblo y además frecuentemente se exhibe por las calles de este pueblo en completo estado de embriaguez y así se presenta en su oficina, cuando por casualidad viene a la misma en horas laborables, lo que le imposibilita para prestar servicio inteligente al pueblo, al municipio.''

Estos cargos fueron formulados en abril, 1930, unos once meses después de la fecha del incidente a que se refiere el cargo número tres.

▇ Con anterioridad a mayo de 1929, el alcalde había formulado ciertos cargos contra un empleado del municipio. Se celebró luego una vista pública, y hubo alguna fricción entre el alcalde y la asamblea. El presidente del Partido Socialista telegrafió al presidente de la asamblea invitando a ese organismo y al alcalde a que vinieran a San Juan. Tanto el alcalde como el presidente de la asamblea entendieron que el propósito del viaje era discutir la situación existente en Arroyo como resultado de los cargos presentados por el alcalde. Este, el presidente de la asamblea y cinco miembros de ese cuerpo, al llegar a San Juan fueron enviados por el presidente del Partido Socialista donde el presidente del Partido Republicano Puro, quien era también prominente en los asuntos de una coalición de los dos partidos. El solicitó del alcalde que retirara los cargos contra el empleado municipal a fin de evitar mayor publicidad y para el bien del partido.

La situación que culminó en un viaje a San Juan fué un asunto local, administrativo y municipal. Los visitantes no asistieron a ninguna convención política, *caucus,* o reunión de comité alguno. El enredo de los asuntos municipales no dejó de ser un asunto municipal meramente porque el alcalde y los miembros de la asamblea fueran invitados a venir a San Juan por el jefe de un partido político, y porque se ejerciera influencia política sobre el alcalde por el jefe de otro partido político por vía de una apelación a la lealtad al partido. La negativa del alcalde a rendirse a tal presión fué por lo menos consistente con la teoría sobre la cual cargó los gastos del viaje al municipio y con su contención a través de

todo el procedimiento de impugnación de que el viaje a San Juan fué para asuntos del municipio.

La Ley Municipal (Leyes de 1928, páginas 335, 357, 359) autoriza el que se residencie y destituya a un alcalde por la asamblea por las siguientes causas específicas:

"(*a*) Cualquier hecho que constituya un delito grave (*felony*);

"(*b*) Cualquier hecho que constituya un delito menos grave (*misdemeanor*) y que implique depravación moral;

"(*c*) Manifiesta negligencia en el desempeño de su cargo, conducta inmoral o incorrecta en el ejercicio del mismo."

Puede admitirse que la partida de quince dólares era un desembolso innecesario, indiscreto e impropio de los fondos municipales. Tal vez técnicamente, la autorización de tal pago por el alcalde equivalió a "conducta incorrecta" en sus actuaciones oficiales. Sin embargo, fué a lo sumo un error de apreciación demostrativo de falta de discernimiento en cuanto a lo que constituye gastos de viaje legítimos que se puedan cargar al municipio. Una serie de esos incidentes podría justificar la destitución. Interpretando las palabras "conducta incorrecta" en conexión con el contexto, no hallamos evidencia satisfactoria alguna de la intención de parte de la Legislatura de que una circunstancia aislada, más o menos dudosa e insignificante, de la índole en cuestión, traiga ese resultado.

En verdad, el alcalde no fué culpable de delito grave, o de un *misdemeanor* que implicara depravación moral. No hay base adecuada para una imputación de *mens rea*. No hubo "manifiesta negligencia en el desempeño de su cargo", porque no hubo cuestión alguna de inadvertencia, omisión o descuido. La actitud del alcalde fué intencional y deliberada. Decir que equivalía a "conducta inmoral o incorrecta" sería fijar una norma de rectitud moral que no estuvo en la mente del legislador.

Pedro W. Rodríguez declaró que estaba en la oficina de Santiago Alvarez, el secretario auditor, cuando llegó Silva

y le dijo a Alvarez que "le ordenaba don Hipólito González que le diera una orden" para ciertos materiales, que Alvarez preguntó para qué eran esos materiales y Silva respondió que eran para su casa; que el testigo estuvo presente cuando Silva vino con la orden firmada por el alcalde, quien estaba en su casa; que el testigo estaba presente cuando Silva vino a pedirle la orden a Alvarez; que el testigo vió la orden el día que fué librada, orden cuya expedición había dispuesto el alcalde; que Alvarez no quería dar la orden y manifestó a Silva que volviera donde el alcalde y le preguntase el fin para el cual interesaba los materiales, y a qué cuenta debían cargarse; que Silva entonces se fué con la orden y volvió con ella donde Alvarez; que cuando Silva trajo la orden por primera vez no estaba firmada por el alcalde; que Silva primeramente vino, regresó y Alvarez le dijo que se volviera, y fué nuevamente donde el alcalde y regresó trayendo consigo la orden firmada.

Alvarez ocupó la silla testifical cuatro veces como testigo de la acusación y dos veces como testigo de la defensa. Si dijo algo respecto a la visita de Silva o acerca de cualquier conversación entre él y Silva en presencia de Rodríguez o de otro modo, ello ha escapado a nuestra atención. Rodríguez era un empleado municipal que había sido destituído por el alcalde y repuesto en su cargo por la corte de distrito, o que tenía cierto pleito contra el alcalde pendiente en la corte de distrito en el momento en que se instituyeron los procedimientos de impugnación pública.

Silva declaró que necesitaba algunos tubos y que el alcalde le dió una orden por los mismos, y que éste firmó la orden. Preguntado si la orden decía que era para su casa o para el municipio, contestó: "Era para mi casa". Entonces surgieron las siguientes preguntas y respuestas:

"¿Entonces él le dijo a Ud. que le daba una orden para que utilizara esos materiales en su casa?—Sí, señor."

Del testimonio de este testigo durante el examen de re-
preguntas hacemos el siguiente extracto luminoso:

"¿Y cuando Ud. vino a buscar los materiales donde don Galo, o
sea, don Hipólito, qué conversación tuvieron Uds.?—No tuvimos nin-
guna.—Don Hipólito, necesito unos tubos. Nada más y me los dió.
—¿Se los dió en seguida?—Sí, señor.—¿Y Ud. los usó en su casa?—
Ahí están.—Dígame una cosa, Silva, ¿Ud. declaró ante el Gran Ju-
rado de· Guayama esto mismo que Ud. declaró ahora?—Sí, señor.—
¿Exactamente?—Exactamente.''

El alcalde dice que Silva le trajo la orden a su casa para
que la firmara en momentos en que él estaba recluído en cama
y le manifestó ·que el plomero municipal necesitaba materia-
les. También declaró que al recobrar la salud preguntó al
plomero qué uso se había hecho de los materiales y al ente-
rarse de los hechos pagó la cuenta de su propio· peculio, re-
prendió severamente a Silva y lo amenazó con procesarlo,
pero más tarde cedió. Silva no fué llamado como testigo de
refutación. Salvo en la forma arriba indicada en el extracto
que se hace de la declaración de Silva, el testimonio del al-
calde no está directamente contradicho por el de ningún otro
testigo ni por ninguna prueba documental. No se pretende
que esta cuenta, que ascendía a siete dólares y centavos, fuera
jamás pagada de los fondos municipales, y la aseveración del
alcalde de que fué pagada por· él está plenamente corroborada.

La orden fué cancelada mediante una observación o memo-
rándum al dorso de la misma. No fué .destruída. No había
razón alguna por la cual no debiera haber sido cancelada, an-
tes o después que el Gran Jurado empezó su investigación
unos seis meses más tarde. El Gran Jurado, después de in-
vestigar las cuestiones envueltas y los cargos 3 y 4 presenta-
dos en dos querellas, se negó a procesar al alcalde.

Del testimonio del alcalde se infiere que Silva vino donde
él como portador de un mensaje del plomero municipal. Si
las manifestaciones lacónicas hechas por Silva respecto a su
conversación con el alcalde pueden ser consideradas como una
contradicción del testimonio del alcalde, también pueden ·ser

consideradas hasta ese mismo extremo como una contradicción del testimonio de Rodríguez relativo a las repetidas visitas de Silva al alcalde. El testimonio de Rodríguez sobre la conversación habida entre Silva y Alvarez no está corroborado ni por Alvarez ni por Silva. Las aseveraciones hechas por Rodríguez acerca de otras cuestiones están substancialmente contradichas por Alvarez.

Admitiendo para los fines de la argumentación que el testimonio de Rodríguez y el de Silva bastaran para establecer un caso *prima facie* de tentativa de malversar fondos municipales, la prueba en su totalidad no es suficientemente clara ni lo bastante robusta para sostener tal imputación.

No se ha demostrado que el municipio haya sido perjudicado en forma alguna por haber dejado el alcalde de rendir su informe anual. Fuera de cualquier cuestión relativa a los méritos de la explicación dada por el alcalde, su negligencia a este respecto no fué tan manifiesta ni de tal carácter serio que justifique su remoción del cargo.

La prueba demuestra que el alcalde es adicto al uso de licores. No convence a una mente justa e imparcial de que, como resultado de ese hábito, o en alguna otra forma, él haya sido culpable de "manifiesta negligencia en el desempeño de su cargo, conducta inmoral o incorrecta en el ejercicio del mismo". En unión del alcalde de otro municipio, el querellado visitó el baile a que se hace referencia en el séptimo cargo. Existe algún conflicto de prueba respecto a la duración de su visita y de su estado y conducta en esa ocasión. Fuera del hecho de que habló con el presidente de la asamblea municipal, que era uno de los miembros de la orquesta, nada hay que indique que la visita fuera de naturaleza oficial o que estuviese en forma alguna relacionada con el desempeño de sus deberes oficiales.

No podemos alabar, ni alabamos, desde luego, la conducta del alcalde en relación con cualquiera de las cuestiones que aquí se ventilan. Tal conducta, por reprochable que sea, no

es suficiente fundamento para su destitución de conformidad con las disposiciones de la Ley Municipal.

*La decisión de la asamblea municipal debe ser revocada.*