FRANCISCO ROBLEDO, ALCALDE DE SANTA ISABEL, recurrente, *v.* COMISIÓN PARA VENTILAR QUERELLAS MUNICIPALES, recurrida.

*Número:* D.A.-66-1     *Resuelto:* 23 de junio de 1967

2

*Carlos J. Irizarry Yunqué* y *Julio Fernández Cabrera,* abogados del recurrente; *J. B. Fernández Badillo, Procurador General,*

y *Elpidio Arcaya, Procurador General Auxiliar,* abogados de la recurrida.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

■ Acogiéndose a lo dispuesto en el Art. 37(9) de la Ley Municipal, Núm. 142 de 21 de julio de 1960, según enmendado por la Núm. 114 de 27 de junio de 1964 (Leyes, págs. 360, 366), 21 L.P.R.A. sec. 1256,(¹) Francisco Robledo recurrió ante este Tribunal para que determinemos si estuvo o no justificada su destitución del cargo de Alcalde de Santa Isabel ordenada por la Comisión para Ventilar Querellas Municipales. Dos son los planteamientos en que descansa el recurrente para solicitar que se deje sin efecto la resolución de la comisión, a saber: (1) que dicho organismo incidió en la apreciación de la prueba y al declarar incurso en falta al querellado recurrente, y, (2) que, aun presumiendo que hubiese cometido los hechos que se estimaron probados, constituyó un error de derecho decretar por ello su destitución.

1. Aníbal Correa y José Matías Santiago, miembros de la Asamblea Municipal de Santa Isabel, presentaron un pliego que contenía seis cargos contra el querellado Francisco Robledo. La Comisión, estimando que los mismos no eran frívolos e insuficientes o que de su faz no resultaba que no conllevaran conducta inmoral o actuaciones ilegales que implicaran abandono, negligencia inexcusable o conducta lesiva a los mejores intereses públicos en el desempeño de sus funciones, Art. 37(4), ordenó la celebración de una vista. En

---

(¹) "En el caso de ser destituido el Alcalde tendrá derecho a recurrir ante el Tribunal Supremo de Puerto Rico dentro del término de diez (10) días después de notificada dicha resolución para que se determine si la misma estuvo o no justificada. Dicha determinación será en procedimiento de 'certiorari' y las conclusiones de hecho de la comisión serán finales."

Aun cuando el procedimiento se denomina de *certiorari* hemos entendido que, considerando la forma en que está redactado el estatuto, la función de revisión que se nos concede es mandatoria y que nos está vedado el ejercicio de discreción sobre la procedencia del auto.

4

el curso de la audiencia el mencionado organismo desestimó los cargos segundo, tercero y sexto (²) por insuficiencia de prueba y los querellantes desistieron de los cargos cuarto y quinto. (³) Quedó pues la controversia limitada al primer cargo.

---

(²) "Que el alcalde querellado señor Francisco Robledo sometió el Informe del Estado de Situación del Municipio de Santa Isable (sic) el día 5 de octubre de 1965 en abierta violación del artículo 35, inciso 3 de la Ley Municipal (21 L.P.R.A. 1254), que es una disposición legal mandatario, sin que se adujeran las razones por su tardanza, impidiendo así que la Honorable Asamblea cumpliera con su cometido.

"     .     .     .     .     .     .     .     .     .

"Que en la construcción de calles de las Parcelas 'El Ojo' de Santa Isabel, cuya buena pro fue adjudicada en subasta al contratista de apellido Marrero, y en ocasión de efectuar dichas obras se inutilizaron ciertos tubos terreros en dicha área los cuales fueron reparados por dicho contratista. El alcalde querellado, con el fin de beneficiar al contratista Marrero sometió una Ordenanza el día 7 de septiembre de 1964 a la Asamblea Municipal para que se aprobara una partida que cubriera los gastos habidos en su reparación, cuyos gastos estaban necesariamente incluídos en la partida aprobada por la Asamblea en la cotización original.

"     .     .     .     .     .     .     .     .     .

"Que en o para los meses de Septiembre y Octubre de 1965, el alcalde querellado gestionó, indujo y consiguió que el contratista Esteban Dueño sometiera a la Junta de Subasta del Municipio de Santa Isabel una proposición para suplir mil metros de cascajo al Municipio de Santa Isabel en un pliego donde un precio abierto de $1.25 con el fin inicial de beneficiar al señor Dueño. La subasta se adjudicó a un ahijado del alcalde querellado por dos centavos menos, sabiendo de antemano el precio por el cual el señor Dueño cotizaría. . . ."

(³) "Que el día 11 de junio de 1965 el alcalde querellado hizo publicar en el periódico 'El Día' un aviso de Subasta requiriendo proposiciones para la compra de una grabadora con 5 micrófonos con sus aditamentos, sin que la Hon. Asamblea Municipal aprobara previamente la transferencia de la partida de sobrantes, según lo exige la Ley. Dicho aviso fue enmendado para que se adquirieran 12 micrófonos, haciéndose la compraventa por solo 5 micrófonos en contravención al mandato de la asamblea.

"     .     .     .     .     .     .     .     .     .

"Que en o para el mes de abril de 1965 el alcalde querellado nombró un comité compuesto de 12 personas requerido por una agencia federal, cuyo nombramiento fue sometido a San Juan sin que se gestionara previamente la aprobación y consentimiento de la Asamblea Municipal a dicho comité tal cual era requisito de dicho convenio ignorando de manera crasa la responsabilidad de dicha Asamblea."

En su parte pertinente el primer cargo reza:

"Que el día 15 de junio de 1965 y en ocasión de celebrar la . . . Asamblea Municipal . . . una reunión extraordinaria para considerar la renuncia de su Presidente, señor Efraín Santiago, el Alcalde querellado irrumpió en el salón de audiencias acompañado de dos personas, y en aparente estado de embriaguez, solicitó el uso de la palabra, a lo que se opuso el asambleísta Juan Santiago. En actitud beligerante, el alcalde señor Francisco Robledo, a la vez que profería frases obscenas acometió al asambleísta José Matías Santiago, no logrando agredirlo por haberse interpuesto la señora esposa del alcalde querellado. La antes referida acción dio lugar a que interviniera el policía Pablo Guzmán, quien al solicitar refuerzo desalojó del salón al alcalde y sus acompañantes, teniendo que continuarse la sesión de la Asamblea bajo puertas cerradas.

La actitud del alcalde querellado fue con la intención maliciosa de interrumpir los trabajos de la Asamblea . . . .

Lo antes relatado constituye conducta inmoral y lesiva a los mejores intereses público . . . ."

El alcalde querellado negó los hechos que se le imputan en este cargo y como defensas afirmativas alegó que los mismos no guardan relación con ninguna violación de la Ley Municipal ni constituyen conducta inmoral o que implique depravación moral.

En su función de aquilatar la prueba los tres comisionados, el Presidente Lic. Juan Enrique Géigel y los Lics. Francisco Parra Toro y Francisco Torres Aguiar, convinieron en los hechos básicos de que el alcalde querellado interrumpió las labores de la asamblea municipal solicitando ser oído, "en su carácter de alcalde", para hacer declaraciones en cuanto al contenido de una información publicada en la prensa diaria en la cual se le hacían ciertas imputaciones, y al intentar agredir a uno de los miembros de dicho organismo municipal.(4) Después de analizar la prueba que se

---

(4) La parte pertinente de las determinaciones de hecho sobre las cuales no hay discrepancia según se relatan en la resolución suscrita por los señores Géigel y Parra Toro, lee como sigue:

calificó de "sumamente conflictiva, imprecisa e insuficiente" sobre la imputación de que el querellado se encontraba en estado de embriaguez, los miembros de la comisión convinieron en forma unánime que no existía base adecuada para llegar a tal determinación. No así en cuanto a la de que el alcalde utilizó lenguaje obsceno. Los señores Géigel y Parra

"20—Prosiguió la sesión de la Asamblea bajo la presidencia del señor Efraín Santiago y poco tiempo después el Asambleísta, señor Miguel Rodríguez, solicitó la palabra para dar lectura a un artículo publicado en el periódico El Día de Ponce, en el cual se hacían fuertes censuras a determinadas actuaciones oficiales del Alcalde querellado.

"21—Mientras se leía dicho artículo a la Asamblea, el Alcalde querellado se encontraba en su oficina en el mismo edificio de la Alcaldía. Estando allí fue informado de las imputaciones que se hacían contra él en el artículo que se leía a la Asamblea.

"22—En compañía de su Secretario, señor Julio Rodríguez, y de otras personas, el Alcalde querellado llegó al salón de la Asamblea Municipal y solicitó el uso de la palabra para contestar las imputaciones hechas contra él.

"23—El Asambleísta Juan E. Santiago se opuso a la solicitud del Alcalde querellado y fue secundado en su oposición por el Asambleísta [sic] José Matías Santiago. El Presidente sostuvo la oposición de dichos asambleístas, negó el uso de la palabra al Alcalde querellado y lo declaró fuera de orden.

"24—El querellado, que desde el momento de llegar al salón de la Asamblea se había manifestado en forma alterada y molesta, se encolerizó por la decisión del Presidente. En tonos violentos y descompuestos increpó fuertemente a los asambleístas presentes, y, en particular a los representantes del Partido Popular Democrático, a quienes acusó de haberse combinado con los asambleístas representantes de la minoría.

"25—El Alcalde, en tonos violentos y airados, reclamaba su alegado derecho a dirigirse a la Asamblea, . . . y concentró sus ataques contra el Asambleísta, señor José Matías Santiago, a quien trató con palabras sumamente duras y mortificantes, mientras se acercaba a él con intención evidente de agredirlo. La agresión no llegó a consumarse debido a la pronta intervención de la esposa del querellado, quien se interpuso entre éste y el señor José Matías Santiago.

"26—Mientras el Alcalde querellado actuaba en la forma antes relatada, su Secretario, Julio Rodríguez, también insultaba e increpaba en tonos violentos al Asambleísta, José Matías Santiago, desafiándolo a que fuese a pelear con él a la calle.

"27—Las actuaciones del Alcalde querellado y de su Secretario produjeron un estado de intensa excitación en el ánimo de los asambleístas municipales y del grupo numeroso de ciudadanos reunidos allí como espec-

Toro dirimieron el conflicto de la evidencia y dieron entero crédito a los que sostienen que mientras increpaba a los miembros de la asamblea Robledo profirió palabras obscenas. El señor Torres Aguiar difirió de este criterio.

■ El alcance de nuestra función al revisar los procedimientos que tienen lugar ante la Comisión para Ventilar Querellas Municipales aparece claramente delimitado por el texto del Art. 37(9) antes citado que expresamente dispone que "las conclusiones de hecho de la comisión serán finales". Este precepto fue incorporado originalmente a la Ley Municipal anterior de 1928 por la enmienda introducida a su Art. 29 mediante la Ley Núm. 4 de 7 de diciembre de 1955 (Leyes, págs. 63, 73). Del debate que tuvo lugar en las cámaras legislativas en ocasión en que se discutía el pro-

---

tadores. Los ánimos se exaltaron de tal modo que el Presidente de la Asamblea ordenó al policía Pablo Guzmán que desalojase todo el público presente en el local y decretó un receso en los trabajos de la Asamblea.

"28—El policía Guzmán solicitó refuerzo al Cuartel de la Policía por temor a no poder controlar solo la situación. Sin embargo, antes de que llegasen al salón el Teniente y el Sargento de la Policía, el policía Guzmán había desalojado el local.

"29—Una de las últimas personas en salir del local fue el Alcalde querellado. Este se resistía a abandonar el salón, a pesar de la orden del Presidente y a pesar de los requerimientos que el policía Guzmán le hacía para que se marchase. Posteriormente, como resultado de las insistentes súplicas de su esposa y otros amigos presentes, el Alcalde querellado se retiró del salón de la Asamblea.

"30—Los trabajos de la Asamblea Municipal estuvieron interrumpidos hasta que se calmaron los ánimos y quedó completamente desalojado el local. Poco rato después, sin presencia de público alguno, se reanudó la sesión y se aprobaron varias ordenanzas.

"31—. . . . . . . . .

"32—. . . . . . . . .

"33—. . . . . ., . . .

"34—. . . . . . . .

"35—La conducta que observó el Alcalde querellado el 15 de junio de 1965 fue sumamente impropia e irreprochable y provocó una situación violenta que muy fácilmente pudo haber culminado en un disturbio con graves consecuencias."

yecto que finalmente se convirtió en la ley mencionada surge que específicamente se intentó asimilar nuestra facultad de revisión a la que usualmente se nos concede respecto a las resoluciones y decisiones de juntas u organismos administrativos, (5) véase, *Diario de Sesiones*, 1955, vol. VI, págs. 1734–1735, y que la intervención con los hechos sólo estaría justificada cuando se adujera que la adjudicación de los mismos carecía de base alguna en la prueba presentada por constituir eilo un planteamiento de derecho, (6) *Diario de Sesiones*, 1955, vol. VII, pág. 222. Véase, *Rodríguez Rivera, Alcalde* v. *Comisión*, 84 D.P.R. 68, 73 (1961).

Aun cuando bajo la legislación anterior a la aprobación de la Ley Núm. 4 de 7 de diciembre de 1955, *supra*, no se disponía expresamente que las determinaciones de hecho eran finales, (7) usualmente habíamos concedido significada defe-

---

(5) Cf. Art. 9 de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 70; *J.R.T.* v. *Milares Realty, Inc.*, 90 D.P.R. 844 (1964); *Junta de Relaciones del Trabajo* v. *Acevedo*, 78 D.P.R. 540 (1955); *Rivera* v. *Junta de Relaciones del Trabajo*, 70 D.P.R. 5 (1949); Sec. 29(b) de la Ley de Salario Mínimo, 29 L.P.R.A. sec. 246(a), *Srio. del Trabajo, etc.* v. *P.R. Cereal Extracts, Inc.*, 83 D.P.R. 267 (1961); *Hilton Hotels* v. *Junta de Salario Mínimo*, 74 D.P.R. 670 (1953); *Sunland Biscuit Co.* v. *Junta de Salario Mínimo*, 68 D.P.R. 371 (1948); Art. 11 de la Ley de Accidentes del Trabajo, 11 L.P.R.A. sec. 12, *Vélez* v. *Comisión Industrial*, 79 D.P.R. 282 (1956).

(6) *Ortega* v. *Comisión Industrial*, 73 D.P.R. 191 (1952); *Sucn. Lledó* v. *Comisión Industrial*, 65 D.P.R. 430 (1945); *Hernández* v. *Comisión Industrial*, 60 D.P.R. 165 (1942).

(7) Véanse, la Ley Núm. 55 de 18 de abril de 1950 (Leyes, págs. 139, 143), la Ley Núm. 98 de 15 de mayo de 1931 (Leyes, págs. 595, 611), que al referirse al pliego de fundamentos que debería acompañarse al recurso de apelación alude a los fundamentos de hecho y de derecho en que se apoya; la Ley Núm. 53 de 28 de abril de 1928 (Leyes, págs. 335, 359), que disponía que este Tribunal al revisar el procedimiento podía considerar "no sólo las cuestiones de derecho . . . sino también los hechos y el peso y alcance de la evidencia"; la Ley Núm. 11 de 25 de junio de 1924 (Leyes, págs. 77, 89), que proveía la apelación para ante la corte de distrito competente de la separación de un alcalde "la cual deberá revisar los hechos, y resolver en definitiva si hubo o no justa causa para la destitución". Bajo la Ley aprobada en 8 de marzo de 1906 (Leyes, págs. 105, 112), y la Ley de 1ro. de marzo de 1902 (E.R. 1902, pág. 247) la destitución de un alcalde por el Gobernador era definitiva.

rencia a las determinaciones de hecho que formulaba el cuerpo juzgador en primera instancia, *Piñero, Gobernador* v. *Grillasca*, 67 D.P.R. 908 (1947); *Tugwell, Gobernador* v. *Campos*, 65 D.P.R. 660 (1946); cf. *De Castro* v. *Junta de Comisionados*, 57 D.P.R. 153 (1940); *Valldejuli* v. *De Castro*, 52 D.P.R. 286 (1937); *Fernández Vanga* v. *Pavía, Alcalde*, 42 D.P.R. 768 (1931); *Rivera Aromí* v. *Asamblea Municipal*, 39 D.P.R. 79 (1929); *Coll* v. *Todd, Alcalde*, 35 D.P.R. 625 (1926), si bien nos reservábamos la facultad de determinar sobre el efecto en derecho de los hechos que se estimaban probados, cf. *Piñero, Gobernador* v. *Barreto, Alcalde*, 68 D.P.R. 145 (1948).

La parte recurrente en su discusión de este primer error no apunta que las determinaciones de la comisión sobre el incidente ocurrido durante la sesión de la asamblea estén huérfanas de prueba. Más bien se limita a impugnar la apreciación respecto al acto del acometimiento de un asambleísta por el alcalde[8] y a insistir en que si el testimonio del testigo principal señor Matías fue descartado en otros particulares tampoco debe merecer crédito respecto a éste. Por lo ya expuesto precedentemente no intervendremos con la función de la comisión de adjudicar los hechos. Conviene apuntar que ante prueba muy similar igual apreciación hicieron tanto el Tribunal de Distrito, como en juicio *de novo*, el Tribunal Superior, Sala de Ponce, en el proceso de naturaleza penal que se siguió contra el querellado por los mismos hechos. Mediante sentencia dictada en 29 de marzo de 1967 en el recurso CE-66-10, *El Pueblo de Puerto Rico* v. *Francisco*

---

[8] El recurrente señala que la Comisión no determinó expresamente que el señor Robledo lanzara un puñetazo o intentara propinarle una bofetada al asambleísta Matías. Aunque el acto del acometimiento no se describió en la forma que se pretende, no hay duda alguna de que se concluyó que el querellado trató de realizar una agresión física, determinación Núm. 25 copiada en el escolio 4. La forma en que se intentó la agresión es intrascendente.

*Robledo García*, rehusamos alterar la aquilatación de la prueba del tribunal de instancia.

2. Bajo la legislación vigente, Art. 37(1), constituye causa para la formulación de cargos a un alcalde la observancia por éste de "conducta inmoral o actuaciones ilegales que impliquen abandono, negligencia inexcusable o conducta lesiva a los mejores intereses públicos, en el desempeño de sus funciones". Se faculta a la comisión para ordenar la destitución cuando resultaren probados los cargos, excepto que si se trata de actuaciones ilegales de carácter leve la sanción se limita a dar publicidad a los hechos probados con los comentarios que se estimen pertinentes, Art. 37(5).

¿Constituyen los hechos probados causa suficiente para ordenar la remoción del querellado? El criterio de la comisión sobre el particular no fue unánime. En esencia la opinión mayoritaria suscrita por los señores Géigel y Parra Toro califican la conducta observada por el recurrente como una intervención indebida en el proceso legislativo municipal atentatoria contra el principio cardinal de la separación de poderes. Fúndanse en la impropiedad al intentar participar en las deliberaciones de la asamblea sin que hubiese mediado una invitación o requerimiento al efecto, en su selección desacertada de foro para defenderse de las imputaciones que consideraba injustificadas, y en su desafío a la autoridad constituida insistiendo en dirigirse a la asamblea y al público allí congregado a pesar de que se le había declarado fuera de orden, y lo que es más censurable, asumiendo una actitud agresiva y violenta y utilizando lenguaje soez y procaz. Resúmese su posición así: "La conducta del Alcalde querellado . . . resultó ser lesiva a los mejores intereses públicos porque la misma constituyó una intromisión indebida e injustificada del poder ejecutivo del municipio . . . en las funciones del poder legislativo de dicho municipio; un abierto desafío a la autoridad del poder legislativo; y un intento del poder ejecutivo para amenazar y coaccionar al poder legisla-

tivo en el desempeño de sus funciones". En consecuencia, con fines ejemplarizantes para evitar que en el futuro se repitan estas intromisiones indebidas del poder ejecutivo en las funciones legislativas, se le impuso la sanción máxima que ordena la ley. Por su parte el comisionado disidente señor Torres Aguiar aunque reconoce que la conducta observada por el alcalde Robledo es censurable, indebida y ofensiva, concluye que no reviste la gravedad necesaria, considerando que fue el producto de un momento de excitación y que no se trata de actuaciones reiteradas de dicho funcionario.

La legislación anterior[9] y las infrecuentes ocasiones

---

(9) *Cuadro Sinóptico de las Causas de Destitución del Alcalde en la Legislación Puertorriqueña (1898–1960)*

| Ley | Causas de Destitución |
|---|---|
| 1. Art. 52 de la Ley Municipal promulgada por Real Decreto de 31 de diciembre de 1896, dejada en vigor por el Art. IX de la Orden General Militar Núm. 1 de 18 de octubre de 1898. | a. "justa causa" determinada por el Gobernador General. |
| 2. Sec. 26 de la Ley de Municipalidades aprobada en 1 de marzo de 1902, Estatutos Revisados 1902, sec. 607, pág. 247. | a. "mala conducta de su parte" determinada por el Gobernador. |
| 3. Sec. 35 de la Ley Municipal aprobada en 8 de marzo de 1906 (Leyes, págs. 105, 112). | a. "en caso que se condujere mal" a juicio del Gobernador. |
| 4. Art. 29 de la Ley Municipal de 1919, según reenactado por la Ley Núm. 11 de 25 de junio de 1924 (Leyes, págs. 77, 91). | Por el Gobernador, por las siguientes causas:<br><br>(a) "cualquier hecho que constituya un delito grave (felony)";<br>(b) "cualquier hecho que constituya un delito menos grave (misdemeanor) que implique depravación moral."<br>(c) "manifiesta negligencia en el desempeño de su cargo, conducta inmoral o incorrecta en el ejercicio del mismo." |

en que hemos revisado la destitución de alcaldes([10]) no nos ofrecen mucha luz sobre el contenido del concepto "actuaciones ilegales que impliquen . . . conducta lesiva a los mejores intereses públicos". En *Rivera* v. *González, Alcalde*, 41 D.P.R. 782 (1931), se le imputaba a un alcalde el ser adicto al licor y su asistencia a un baile de mujeres prostitutas, en desatención de sus obligaciones oficiales. Al revocar la destitución decretada por la asamblea, dijimos que tal conducta aunque reprobable no constituía la conducta inmoral o incorrecta en el ejercicio del cargo que estuvo en mente del legislador. En *Díaz* v. *Charneco*, 48 D.P.R. 536 (1935), nos referimos a que el concepto causa justificada requería que hubiese una relación de naturaleza sustancial que afectará los intereses del pueblo. En sentido similar nos pronunciamos en *Asamblea Mpal.* v. *Steidel, Alcalde*, 54 D.P.R. 832 (1939).

---

5. (a) Art. 29 de la Ley Municipal de 1928, Núm. 53 de 28 de abril de 1928 (Leyes, págs. 335, 359).

Por la asamblea municipal por las mismas causas establecidas en la Ley Núm. 11 de 25 de junio de 1924.

(b) Enmendado por la Ley Núm. 98 de 15 de mayo de 1931 (Leyes, págs. 595, 609).

Por la asamblea municipal "por causa justificada", o por el Gobernador cuando la asamblea rehusare actuar.

(c) Enmendado por la Ley Núm. 55 de 18 de abril de 1950 (Leyes, págs. 139, 141).

a. Por una Comisión permanente de la Asamblea Legislativa, por razón de conducta gravemente inmoral o actuaciones ilegales en el desempeño de sus funciones.

(d) Enmendado por la Ley Núm. 4 de 7 de diciembre de 1955 (Leyes (3), págs. 63, 69).

Por la Comisión para Ventilar Querellas Municipales, por razón de conducta inmoral o actuaciones ilegales en el desempeño de sus funciones.

([10]) Véanse, en adición a los casos mencionados en el texto de la opinión, *Asamblea Municipal* v. *González, Alcalde*, 55 D.P.R. 542 (1939); *De Castro* v. *Junta de Comisionados*, 57 D.P.R. 153 (1940); *Piñero, Gobernador* v. *Grillasca*, 67 D.P.R. 908 (1947); *Piñero, Gobernador* v. *Barreto, Alcalde*, 68 D.P.R. 145 (1948).

█ La forma en que está redactado el estatuto sugiere que el criterio rector para la destitución no participa de naturaleza punitiva para el incumbente sino que responde al propósito de evitar lesiones al interés público. La medida debe propender al mejoramiento del servicio público, y por tanto debe tratarse de conducta detrimental para la disciplina y eficiencia de la función pública. En general, Antieau, *Municipal Corporation Law* (1966), vol. 3, Sec. 22.22; Yokley, *Municipal Corporations* (1957), Sec. 339; McQuillin, *Municipal Corporations* (3a. ed., 1949) Sec. 12.237. En tal sentido no podemos concluir que aparezca meridianamente claro que la actuación del querellado haya afectado en forma sustancial e irremediable el funcionamiento del régimen municipal. Si bien es cierto que la actuación del querellado interrumpió la sesión de la asamblea la prueba demuestra que luego de ser desalojado el recinto se continuaron las deliberaciones. Cualquier otro ciudadano que hubiese incurrido en la misma conducta sólo hubiese sido enjuiciado por la alteración de la paz y el acometimiento, como lo fue el aquí querellado. De paso, conviene apuntar que nada hay actualmente en la ley que expresamente prohiba la comparecencia del alcalde a las sesiones del cuerpo legislativo municipal. En la Ley Municipal de 1906, *supra*, se incorporó una disposición al efecto de que "El Alcalde no concurrirá a las sesiones del Concejo, pero comparecerá ante él cuando fuere requerido especialmente por dicho Concejo con el fin de informarle de los asuntos concernientes al municipio y que el Concejo pudiese desear." (Art. 31.) Así se conservó en la Ley Núm. 11 de 25 de junio de 1924, *supra* (Sec. 29), pero se eliminó desde la adopción de la Ley Municipal de 1928.

Por otro lado tiene que militar el hecho de que se trata de un funcionario seleccionado en elecciones generales que recibió la confianza de los habitantes del municipio y que la causa alegada no es de tal gravedad y consecuencias que requiera que se ignore el mandato popular.

14

Una consideración detenida de todas las circunstancias concurrentes nos lleva a la conclusión de que probablemente lo que existe es un estado de fricción entre el alcalde y algunos de los miembros de la asamblea municipal que de continuar puede causar perjuicios a los asuntos públicos. Así se reconoce en las determinaciones de hecho formuladas.(11) Pero el remedio para esta situación está provisto en el Art. 107 de la vigente Ley Municipal, 21 L.P.R.A. sec. 1741, que tiene su origen en el Art. 11 de la Ley Municipal de 1928, *supra*, pág. 343. Véase, *In Re Ramírez* v. *Gobernador*, 44 D.P.R. 329 (1932).(12)

En forma alguna estamos interviniendo con las determinaciones de hecho de la comisión; sólo resolvemos que la conducta que se estimó probada no constituye como *cuestión de derecho* la "conducta inmoral o actuaciones ilegales que impliquen abandono, negligencia inexcusable o conducta lesiva a los mejores intereses públicos, en el desempeño de sus funciones" que como causa de destitución estatuyó el legislador. Pretender que nuestra función se limita a determinar si la resolución destituyendo al alcalde está justificada es un criterio castrante que no podemos adoptar pues prácticamente convertiría a la comisión en el árbitro absoluto y único de los destinos municipales, privando a los perjudicados de acudir a un foro adecuado para impugnar sus conclusiones de derecho.

Finalmente deseamos establecer con toda claridad que en forma alguna condonamos las actuaciones del alcalde que-

(11) "2—Poco después de haber tomado posesión en enero de 1965 la administración municipal de Santa Isabel electa en noviembre del año anterior, comenzaron a surgir fricciones entre el Alcalde y algunos miembros de la Asamblea Municipal."

(12) Es significativo que tanto esta disposición como la relativa a la revisión judicial de las actuaciones de la asamblea en los procedimientos de destitución del alcalde se incorporan cuando se traslada del Gobernador a este cuerpo la facultad de instruir el juicio de impugnación pública (*impeachment*).

rellado. Su conducta, intento de caciquismo provinciano,(13) atenta contra la raíz misma del sistema de gobierno democrático de los municipios. Pero la ley no nos autoriza a determinar sobre la idoneidad del querellado; corresponde a los organismos políticos y a los electores pasar juicio sobre sus calificaciones.

*En virtud de lo expuesto se dejará sin efecto la resolución dictada por la Comisión para Ventilar Querellas Municipales y se ordenará el archivo definitivo del cargo imputado al Alcalde de Santa Isabel Francisco Robledo García.*

El Juez Presidente Señor Negrón Fernández no intervino. El Juez Asociado Señor Santana Becerra disintió en una opinión con la cual concurre el Juez Asociado Señor Hernández Matos.

—O—

Opinión Disidente del Juez Asociado Señor Santana Becerra en la cual concurre el Juez Asociado Señor Hernández Matos.

San Juan, Puerto Rico, 23 de junio de 1967

El Art. 37 de la Ley Municipal, Ley Núm. 142 de 21 de julio de 1960, según fue enmendado por la Ley Núm. 114 de 27 de junio de 1964, provee para la destitución del Alcalde, por razón de conducta inmoral o actuaciones ilegales que impliquen abandono, negligencia inexcusable o conducta lesiva a los mejores intereses públicos, en el desempeño de sus funciones. Para entender de la destitución, la Ley creó la "Comisión para Ventilar Querellas Municipales" organismo ante quien se formulan cargos al Alcalde. Dispone la Ley de manera expresa que la Comisión resolverá si se han probado o no los cargos imputados y, específicamente, que "En caso de que se hubieran probado, *procederá a destituir al Alcalde,*

---

(13) El querellado ocupa los cargos de Presidente del Comité Local Municipal del Partido Popular Democrático y de la Unión Local 847 Independiente de Santa Isabel. Véase, *J.R.T.* v. *Unión Local 847,* 91 D.P.R. 772 (1965).

quien quedará definitivamente separado de su cargo". Se estatuye, sin embargo, que en casos en que de los hechos probados surgiere que se trata de actuaciones ilegales de carácter leve, la Comisión podrá disponer que el Alcalde continúe desempeñando su cargo y que se dé publicidad de los hechos probados, con los comentarios que tenga a bien hacer sobre los mismos. Si los cargos no son suficientes o no se han probado, el Alcalde quedará desempeñando sus funciones.

Dice el propio Art. 37 que en el caso de ser destituido el Alcalde tendrá derecho a recurrir ante el Tribunal Supremo de Puerto Rico . . . para que se determine si la resolución destituyéndolo estuvo o no justificada, y esta determinación se hará en procedimiento de "certiorari" en que las conclusiones de hecho de la Comisión serán finales.

Cuatro supuestos de ley son normativos de la función revisora de este Tribunal en casos de esta índole: (1) Si la Comisión halla los cargos probados deberá, por mandato de ley, destituir al Alcalde excepto que, (2) si a juicio de la Comisión los hechos probados demuestran actuaciones ilegales de carácter leve, dentro de su discreción puede ella disponer que se dé publicidad a dichos hechos con los comentarios que tenga a bien formular, sin que haya destitución; (3) la competencia de este Tribunal es determinar si la resolución destituyendo al Alcalde estuvo o no justificada; y (4) al hacer dicha determinación debe aceptar las conclusiones de hecho de la Comisión que la Ley declara ser finales.

Desde el punto de vista estatutario las normas de revisión están claramente definidas. Por supuesto, compete siempre a los tribunales, se disponga o no por ley, honrar las garantías constitucionales del debido procedimiento. Unas conclusiones de hecho de la Comisión meramente caprichosas, arbitrarias o en ausencia de prueba que sustancialmente las sostenga, serían contrarias al debido procedimiento y no podrían prevalecer. Cf. *Schware* v. *Board of Bar Examiners*, 353 U.S. 232, 239; *Konigsberg* v. *State Bar*, 353 U.S. 252;

*Slochower* v. *Board of Education,* 350 U.S. 551, 559; *Wieman* v. *Updegraff,* 344 U.S. 183, 192.

Nuestra función, pues, se circunscribe a velar porque no haya carencia en el récord de prueba sustancial en apoyo de las conclusiones de hecho de la Comisión. Si existe tal prueba sustancial no creo, dentro de la norma de revisión sentada por el Legislador, que podamos ir más allá interviniendo con las referidas conclusiones de hecho, ni creo que sea permisible el que apreciemos o evaluemos la prueba en forma distinta o que en tal evaluación sustituyamos el criterio nuestro por el de la Comisión. La Comisión es a manera de un tribunal del pueblo para juzgar a un funcionario electo por el pueblo. El mandato de que las conclusiones de hecho de ese tribunal sean finales debe tener, y tiene, una profunda razón de ser, ya que el Legislador no acostumbra a hacer cosas vacuas.

Sujeto a las normas de derecho anteriormente expuestas en cuanto a cuáles deben ser mis atribuciones, paso a exponer mi criterio en la decisión de este recurso.

La Comisión determinó como cuestión de hecho que poco después de haber tomado posesión en 1965 el Alcalde querellado, surgieron fricciones y diferencias entre el Alcalde y miembros de la Asamblea Municipal; que en sesión de la Asamblea de 2 de junio de 1965 se le aceptó la renuncia a su Presidente Sr. Efraín Santiago; que días después el Alcalde convocó a la Asamblea a sesión extraordinaria para el 15 de junio de 1965 para considerar la sustitución de la vacante del Presidente; que en la terna sometida para asambleísta por el Alcalde iba un hijo suyo; luego hubo dudas sobre la validez de la aceptación de la renuncia del Presidente y por tal motivo y debido a que la sesión del 15 de junio de 1965 se convocó para cubrir dicha vacante, la sesión provocó gran interés en los ciudadanos de Santa Isabel y al comenzar la misma el local se hallaba ocupado a capacidad por alrededor de 100 personas que habían acudido como espectadores.

Concluyó la Comisión que en el curso del debate sobre la validez o nulidad de la aceptación de la renuncia del Presidente "surgió un incidente motivado por el señor Vidal Bajandas, Líder Recreativo del municipio de Santa Isabel, quien se hallaba presente entre los espectadores. El señor Bajandas, en aparente estado de embriaguez, hablaba en voz alta, causando molestias a los Asambleístas. Posteriormente, solicitó el uso de la palabra, la cual le fue denegada por el Presidente Interino, señor Aníbal Correa. El señor Bajandas persistió en su actitud perturbadora a tal extremo que el Presidente Interino ordenó al policía estatal Pablo Guzmán, destacado allí para velar por el mantenimiento del orden, que lo sacase del salón". El policía cumplió la orden y prosiguió el debate que concluyó con la declaración de la nulidad de la aceptación de la renuncia. Del seno de la Asamblea salió entonces una comisión para traer ante la misma al Sr. Efraín Santiago quien compareció, retiró su renuncia y, con un voto de confianza que le otorgó la Asamblea, asumió de nuevo su cargo de Presidente.

Continúan así las conclusiones de hecho de la Comisión:

"20—Prosiguió la sesión de la Asamblea bajo la presidencia del señor Efraín Santiago y poco tiempo después el Asambleísta, señor Miguel Rodríguez, solicitó la palabra para dar lectura a un artículo publicado en el periódico El Día de Ponce, en el cual se hacían fuertes censuras a determinadas actuaciones oficiales del Alcalde querellado.

21—Mientras se leía dicho artículo a la Asamblea, el Alcalde querellado se encontraba en su oficina en el mismo edificio de la Alcaldía. Estando allí fue informado de las imputaciones que se hacían contra él en el artículo que se leía a la Asamblea.

22—En compañía de su Secretario, señor Julio Rodríguez, y de otras personas,[*] el Alcalde querellado llegó al salón de la Asamblea Municipal y solicitó el uso de la palabra para contestar las imputaciones hechas contra él.

---

[*]El Policía Guzmán, quien había bajado del segundo piso llevando al Sr. Vidal Bajandas, declaró que el Alcalde subió con Bajandas nuevamente y con Julito Rodríguez.

23—El Asambleísta Juan E. Santiago se opuso a la solicitud del Alcalde querellado y fue secundado en su Oposición por el Asambleísta José Matías Santiago. El Presidente sostuvo la oposición de dichos asambleístas, negó el uso de la palabra al Alcalde querellado y lo declaró fuera de orden.

24—El querellado, que desde el momento de llegar al salón de la Asamblea se había manifestado en forma alterada y molesta, se encolerizó por la decisión del Presidente. En tonos violentos y descompuestos increpó fuertemente a los asambleístas presentes, y, en particular a los representantes del Partido Popular Democrático, a quienes acusó de haberse combinado con los asambleístas representantes de la minoría.

25—El Alcalde, en tonos violentos y airados, reclamaba su alegado derecho a dirigirse a la Asamblea, utilizando frases obscenas que llegaron al alcance del oído de las personas allí presentes, y concentró sus ataques contra el Asambleísta, señor José Matías Santiago, a quien trató con palabras sumamente duras y mortificantes, mientras se acercaba a él con intención evidente de agredirlo. La agresión no llegó a consumarse debido a la pronta intervención de la esposa del querellado, quien se interpuso entre éste y el señor José Matías Santiago.

26—Mientras el Alcalde querellado actuaba en la forma antes relatada, su Secretario, Julio Rodríguez, también insultaba e increpaba en tonos violentos al Asambleísta, José Matías Santiago, desafiándolo a que fuese a pelear con él a la calle.

27—Las actuaciones del Alcalde querellado y de su Secretario produjeron un estado de intensa excitación en el ánimo de los asambleístas municipales y del grupo numeroso de ciudadanos reunidos allí como espectadores. Los ánimos se exaltaron de tal modo que el Presidente de la Asamblea ordenó al policía Pablo Guzmán que desalojase todo el público presente en el local y decretó un receso en los trabajos de la Asamblea.

28—El policía Guzmán solicitó refuerzo al Cuartel de la Policía por temor a no poder controlar solo la situación. Sin embargo, antes de que llegasen al salón el Teniente y el Sargento de la Policía, el policía Guzmán había desalojado el local.[*]

[*]El Policía Guzmán, testigo del Alcalde, declaró que envió aviso al Cuartel y al Teniente porque las cien personas que allí habían, unas se pararon y todas hablaban, unos que dejaran hablar al Alcalde y otros que no lo dejaran hablar y creyó que pasaría algo anormal.

29—Una de las últimas personas en salir del local fue el Alcalde querellado. Este se resistía a abandonar el salón, a pesar de la orden del Presidente y a pesar de los requerimientos que el policía Guzmán le hacía para que se marchase. Posteriormente, como resultado de las insistentes súplicas de su esposa y otros amigos presentes, el Alcalde querellado se retiró del salón de la Asamblea.

30—Los trabajos de la Asamblea Municipal estuvieron interrumpidos hasta que se calmaron los ánimos y quedó completamente desalojado el local. Poco rato después, sin presencia de público alguno, se reanudó la sesión y se aprobaron varias ordenanzas.

31—Dos días más tarde el policía Guzmán juró denuncia de propio conocimiento contra Julio Rodríguez, Secretario del Alcalde, por delito de alteración de la paz, y contra el Alcalde querellado por delito de acometimiento y agresión grave. Ambas denuncias fueron juradas ante el Juez de Distrito de Salinas porque el Juez de Paz de Santa Isabel se inhibió en el caso.

32—El juicio en los dos casos se celebró en la Sala de Salinas del Tribunal de Distrito y allí fueron convictos ambos acusados del delito imputado a cada uno.

33—Apelado a la Sala de Ponce del Tribunal Superior el caso contra Julio Rodríguez, éste se declaró culpable del delito que se le imputaba.

34—El Alcalde querellado también apeló a la Sala de Ponce del Tribunal Superior la sentencia dictada contra él por el Tribunal de Distrito, la cual fue confirmada y actualmente se halla en grado de apelación ante el Tribunal Supremo de Puerto Rico.[*]

35—La conducta que observó el Alcalde querellado el 15 de junio de 1965 fue sumamente impropia e irreprochable y provocó una situación violenta que muy fácilmente pudo haber culminado en un disturbio con graves consecuencias.

36—Los querellantes alegaron en el pliego de cargos presentados por ellos que el Alcalde querellado irrumpió 'en el Salón de Audiencias . . . en aparente estado de embriaguez . . . a la vez que profería frases obscenas . . .'. La prueba presentada sobre la imputación de embriaguez fue sumamente conflictiva,

---

[*]Por sentencia de 29 de marzo de 1967 este Tribunal confirmó la convicción del Alcalde por Acometimiento Grave.

imprecisa e insuficiente. Algunos testigos afirmaron que el querellado actuó en la forma reseñada en los párrafos anteriores en evidente estado de embriaguez. Sin embargo, considerada la prueba en conjunto, la Comisión no ha hallado en la misma base adecuada para llegar a la conclusión de que el querellado estaba en estado de embriaguez durante la noche del 15 de junio de 1965. En cuanto a la imputación de lenguaje obsceno, la prueba fue también contradictoria y conflictiva, pero analizada la misma con detenimiento la Comisión ha dirimido el conflicto de la evidencia y aceptando la que le mereció entero crédito ha quedado completamente convencida de que el Alcalde querellado utilizó lenguaje obsceno mientras increpaba a los miembros de la Asamblea Municipal." (1)

---

(1) El distinguido Comisionado Lcdo. Torres Aguiar, en su Resolución disidente resumió así la prueba en lo que respecta al uso de lenguaje obsceno:

". . . En cuanto a la imputación de haber hecho uso de lenguaje obsceno, los demás compañeros de la Comisión estiman que 'la prueba fue también contradictoria. y conflictiva' pero concluyen que esa misma prueba les convenció de que el Alcalde incurrió en la falta alegada, contrario a nuestro criterio. Veamos.

"El testigo y asambleísta querellante José Matías Santiago, sin lugar a dudas, persona apasionada y muy interesada en que prosperaran los cargos, declaró que al llegar el alcalde a la Asamblea 'pidió el uso de la palabra' y 'se veía en aparente estado de embriaguez, dando manotazos y hablando en una forma estentórea, desordenada, impropia . . .' (T. de E. 158–159 de 6 de abril 66). Al declarársele fuera de orden 'el Sr. Francisco Robledo se enfogonó . . . y le dijo a la Asamblea a toda boca allí que él no hablaba porque esa era una asamblea republicana'. Según el testigo, el alcalde dijo: 'Coño, yo no puedo hablar aquí porque esta es una asamblea de republicanos' (T. de E. 159 de 6 de abril 66). Más tarde, según testimonio de Matías Santiago, el Alcalde le dice al testigo 'Coño, tu eres el primer sinverguenza, canalla' y luego dice 'Coño, carajo, esta es una asamblea republicana, aquí no me dejan hablar, este es un chorro de sinverguenzas y el primer sinverguenza y canalla eres tú' (T. de E. 169, de 6 de abril 66). Luego el testigo repite lo mismo (T. de E. 170, de 6 abril 66). El testigo sigue declarando que nunca se quejó a la Policía de la actitud del alcalde. (T. de E. 176 de 6 abril 66); que no declaró en el Tribunal Superior sobre el estado de embriaguez del alcalde 'porque no me lo preguntaron' (T. de E. 180 de 6 de abril 66); que en el Tribunal Superior, al declarar el testigo, dijo que el alcalde había dicho 'coño' pero la palabra 'carajo' parece que se le pasó. (T. de E. 184).

"     .     .     .     .     .     .     .     .

"El testigo de los querellantes Pedro Juan Moreno, maestro de instrucción pública (T. de E. 194, de 6 abril 66) y asambleísta estadista

En el seno de la Comisión, era una función legítima el que un Comisionado discrepara de otros en la apreciación de la prueba y en cuanto a factores de credibilidad. A ellos les tocaba realizar esa función. No debe ser atribución de este Tribunal el decidir cuál de los criterios de la Comisión

---

republicano (T. de E. 195 de 6 abril 66), y quien nos mereciera crédito por su demostrada imparcialidad, declaró que 'entró el alcalde en una actitud . . . estaba alterado y entonces pidió la palabra' y objetó un asambleísta quien fue secundado por José Matías Santiago (T. de E. 195 de 6 abril 66). Al no dársele la palabra 'dijo que la asamblea era una asamblea republicana' (T. de E. 196 de 6 abril 66). Después del incidente con Matías Santiago, el alcalde 'se retiró (de la asamblea) porque él decidió retirarse y consideró que la objeción que tenía la señora esposa de él, además de su amigo, para que él se retirara, era válida y entonces decidió retirarse de la asamblea' (T. de E. 199 de 6 abril 66). Al preguntársele al testigo si oyó al alcalde proferir alguna palabra obscena, contestó, 'Bueno por lo menos yo no lo recuerdo'. (T. de E. 216 de 6 de abril 66). A preguntas del Comisionado que suscribe, el testigo declaró que lo que el Alcalde hacía era hablar duro, sencillamente duro. (T. de E. 218). A preguntas del Comisionado Parra Toro, en cuanto a si el testigo oyó alguna palabra obscena, el testigo dice 'no recuerdo, porque fue una cosa tan . . .' (T. de E. 219 de 6 abril 66).

"El siguiente testigo lo fue Efraín Santiago Santiago, maestro de estudios sociales de la escuela intermedia (T. de E. 223 de 6 abril 66) y Presidente de la Asamblea Municipal en la noche de los hechos. (T. de E. 229 de 6 de abril 66). Este testigo de los querellantes declaró que el alcalde entró a la Asamblea 'en un estado de incomodidad', que eso era todo (T. de E. 232 de 6 abril 66); que no vió la agresión (T. de E. 237–238 de 6 de abril 66). A preguntas del Señor Presidente de la Comisión, el testigo declaró que el alcalde, mientras su esposa le tapaba la boca, dijo: 'coño, déjame hablar, yo puedo hablar', que aparte de esa frase, el alcalde no pronunció ninguna otra palabra obscena (T. de E. 246 de 6 abril 66); que al asambleísta Sr. Matías Santiago lo que el alcalde le dijo fue 'tu eres el culpable de todo esto' (T. de E. 246 de 6 abril 66). A preguntas del señor abogado de los querellantes, el testigo declaró que el alcalde, refiriéndose al Sr. Matías Santiago 'me parece que dijo sinverguenza, tu eres el culpable de todo esto'.

"Hasta aquí la prueba de los querellantes en cuanto al uso de lenguaje obsceno, que, como ya antes dijimos, es sumamente conflictiva y contradictoria, a tal extremo de que no nos convence. Posiblemente, el alcalde usó el vocablo 'coño' en un momento de indignación, excitación y coraje, al intervenir su esposa con él pero la prueba, repetimos, no nos satisface para hacer una conclusión concreta en cuanto a ese hecho. El único testigo que pone en labios del querellado el uso de palabras ofensivas, en forma continua, lo es el querellante Matías Santiago. El policía que practicó la investigación de los hechos Pablo Guzmán, quien fuera

deba prevalecer sobre el otro. Los hechos probados que nos obligan son los determinados por la Comisión, en este caso una mayoría. Así expresamente se dispone en el Art. 37, párrafo (b) de la Ley. En relación con disposiciones estatutarias similares, confróntense las expresiones de este Tribunal en *Junta Relaciones del Trabajo* v. *Namerow*, 69 D.P.R. 82, 87 (1948); *Cepeda* v. *Comisión Industrial*, 76 D.P.R. 801, 810 (1954); *Junta Rel. Trabajo* v. *Simmons Int'l Ltd.*, 78 D.P.R. 375, 386 (1955); *Tugwell, Gobernador* v. *Campos*, 65 D.P.R. 660, 674 (1946); *Piñero, Gobernador* v. *Grillasca*, 67 D.P.R. 908, 925 (1947); cf. *Sucn. Muñoz* v. *Cepeda*, 72 D.P.R. 593, 607 (1951); *J.R.T.* v. *Línea Suprema, Inc.*, 89 D.P.R. 840 (1964), y casos ahí citados.

He examinado minuciosamente el récord, y las conclusiones de hecho de la Comisión están cumplidamente sostenidas con prueba competente. Sus conclusiones de derecho, apoyadas en esos hechos, no son arbitrarias ni caprichosas. Demuestran una serena y ponderada justipreciación de la seriedad de la conducta enjuiciada. Concluyó que las actuaciones del Alcalde constituían "actuaciones ilegales que implican . . . conducta lesiva a los mejores intereses públicos, en el desempeño de sus funciones." Esta conclusión es correcta. Sus actuaciones fueron ilegales—Arts. 358 y 368 Código Penal, ed. 1937; Ley de 10 de marzo, 1904—y lesivas también al interés público, ya que una vez que la Asamblea le negó permiso para manifestarse, su conducta insistiendo en ello sin ser un asambleísta

---

llamado a declarar por el querellado, declaró que no oyó al alcalde proferir palabras obscenas ni el uso de la palabra 'coño' (T. de E. 12, de 10 de agosto 66).[*] El testigo declaró que vio 'bien' al alcalde, 'excepto que se incomodó y protestó enérgicamente porque no lo dejaban hablar' (T. de E. 17 de 10 de agosto 66)."

---

[*]*Nota:* El Policía Guzmán afirmó varias veces que él no vio el incidente del Alcalde y lo desconocía porque en ese momento intervenía, para sacarlo afuera, con el Secretario Sr. Rodríguez, quien desafiaba al asambleísta Sr. Matías a que saliera.

fue una deliberada provocación dirigida a subvertir el orden institucional, en menoscabo del debido respeto a las funciones de ley de la otra rama del gobierno municipal, induciendo al público mismo a intervenir en las deliberaciones de la Asamblea. Toda lesión deliberada a un orden institucional de ley establecido es un acto de conducta serio, más aún si lo realiza deliberadamente quien por ley viene obligado a mantener ese orden institucional.

Una Asamblea Municipal atemorizada por o sujeta al capricho de un Alcalde deja de ser el organismo representativo útil que la ley ha creado para mantener el balance de poder y frenar la voluntad unipersonal del ejecutivo, en sus excesos o desmanes. Razonables como son las conclusiones de la Comisión sostenidas con prueba sustancial, no creo que las mismas revelen actuaciones ilegales leves. La Comisión no las consideró así con buen sentido de apreciación de los hechos y circunstancias presentes.

En *Rodríguez Rivera, Alcalde* v. *Comisión*, 84 D.P.R. 68 (1961), sostuvimos la destitución de un Alcalde en circunstancias en que habiendo obtenido por su gestión personal de la Autoridad sobre Hogares ciertos materiales de construcción sobrantes, en la creencia que podía hacerlo los invirtió en la construcción de estaciones de leche en la zona rural y otras para la comunidad, sin que hubiera lucro personal, pero sin cumplir con las reglas técnicas de ley sobre disposición de la propiedad municipal, habiéndose determinado que el material le había sido cedido en su capacidad de alcalde.

En la escala de valores éticos no creo que la lesión al interés público en ese caso y sus circunstancias, de haber existido alguna, fuera de más trascendencia que la lesión al interés público en el de autos.

Si como concluyó la Comisión y debe ser, las actuaciones ilegales del Alcalde querellado no son de carácter leve, la destitución es mandatoria por disposición expresa del Art. 37

de la Ley Municipal. Por ser del criterio que la resolución destituyendo al Alcalde está justificada, disiento.